Mark P. Robinson, Jr., SBN 054426
Daniel S. Robinson, SBN 244245
**ROBINSON CALCAGNIE ROBINSON
SHAPIRO DAVIS, INC.**
19 Corporate Plaza Drive
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292
mrobinson@rcrsd.com
drobinson@rcrsd.com

Donald H. Slavik (Pro Hac Vice Pending)
**ROBINSON CALCAGNIE ROBINSON
SHAPIRO DAVIS, INC.**
2834 Blackhawk Court
Steamboat Springs, Colorado 80487-2018
Telephone: (949) 269-4284
Facsimile: (949) 720-1292
dslavik@rcrsd.com

*Attorneys for Indirect Purchaser Plaintiffs*
*(Complete list of Plaintiffs on signature page)*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA-SAN FRANCISCO DIVISION

| | |
|---|---|
| **EVERETT ELLIS; FREDRICK P. HEGE, JR.; MIKE FISHER; MICHAEL W. DAVIS; JANE SCHMIT; JOHNNY WALKER; JOHN E. MCDOWELL; MARTA MICHAUD; TIMOTHY DUFFY;SEAN G. TARJOTO; TODD STOWATER; DAVID C. KELLER; JAMIE THAEMERT; SCOT DUNLAP; SCOTT HUFFMAN; CHARLES RUSHER; JENNIFER RUSHER; DAVID STANDRIDGE; TROY GIBSON; GARTH RUSSELL, M.D.; BHRAC, LLC, d/b/a BEVERLY HILLS RENT-A-CAR; BEVERLY HILLS LEASING LLC; CETACEA SOUND, INC.; COMPUTING SOLUTIONS, INC., d/b/a WIRED! BY COMPUTING SOLUTIONS, d/b/a WIRED! TECHNOLOGY PARTNERS; GOSSETT MOTOR CARS, INC., d/b/a GOSSETT KIA; GOSSETT MOTOR CARS,** | ) Civil Case No.<br>)<br>) **ANTITRUST CLASS ACTION**<br>) **COMPLAINT**<br>) **INJUNCTIVE**<br>) **STATE ANTITRUST, UNFAIR**<br>) **TRADE PRACTICE AND**<br>) **CONSUMER PROTECTION**<br>) **STATUTES - DAMAGES**<br>)<br>) **Indirect Purchasers' Complaint**<br>) **Class Action**<br>)<br>)<br>) **DEMAND FOR JURY TRIAL**<br>)<br>)<br>)<br>)<br>) |

1

1  INC., d/b/a GOSSETT MAZDA;                                )
2  GOSSETT MOTOR CARS, INC., d/b/a                           )
   GOSSETT HYUNDAI; GOSSETT MOTOR                            )
   CARS, INC., d/b/a GOSSETT MITSUBISHI;                     )
3  GOSSETT MOTOR CARS, INC., d/b/a                           )
4  GOSSETT AUDI; GOSSETT MOTOR CARS,                         )
   INC., d/b/a GOSSETT VOLKSWAGEN;                           )
5  GOSSETT MOTOR CARS, INC., d/b/a                           )
   GOSSETT PORSCHE; GOSSETT MOTOR                            )
6  CARS, INC., d/b/a/ GOSSETT CHRYSLER/                      )
7  JEEP/DODGE; GOSSETT MOTOR CARS,                           )
   INC., d/b/a GOSSETT FIAT OF MEMPHIS;                      )
8  WE 3 GOSSETT, LLC, d/b/a GOSSETT                          )
   VOLKSWAGEN OF GERMANTOWN;                                 )
9  WE 3 GOSSETT, LLC, d/b/a GOSSETT KIA SOUTH; )
10 WE 3 GOSSETT, LLC, d/b/a GOSSETT HYUNDAI                  )
   SOUTH; WE 3 GOSSETT, LLC, d/b/a GOSSETT                   )
11 FIAT; AUTORAMA, INC., d/b/a MERCEDES BENZ                 )
   OF MEMPHIS, on behalf of themselves                       )
12 and all others similarly situated,                        )
13                                                           )
                     *Plaintiffs,*                           )
14 v.                                                        )
                                                             )
15 PANASONIC CORPORATION; PANASONIC                          )
16 CORPORATION OF NORTH AMERICA;                             )
   SANYO ELECTRIC GROUP, LTD.; SANYO                         )
17 ELECTRONIC DEVICE (U.S.A.)                                )
   CORPORATION; TAIYO YUDEN CO., LTD.;                       )
18 TAIYO YUDEN (USA) INC.; NEC TOKIN                         )
19 CORPORATION; NEC TOKIN AMERICA,                           )
   INC.; KEMET CORPORATION; KEMET                            )
20 ELECTRONICS CORPORATION; NIPPON                           )
21 CHEMI-CON CORPORATION; UNITED                             )
   CHEMI-CON CORPORATION; HITACHI                            )
22 CHEMICAL CO. LTD.; HITACHI CHEMICAL                       )
   COMPANY AMERICA, LTD.; NICHICON                           )
23 CORPORATION; NICHICON (AMERICA)                           )
24 CORPORATION; AVX CORPORATION;                             )
   RUBYCON CORPORATION; RUBYCON                              )
25 AMERICA INC.; ELNA CO., LTD.; ELNA                        )
   AMERICA INC.; MATSUO ELECTRIC CO.,                        )
26 LTD.; TOSHIN KOGYO CO., LTD.; VISHAY                      )
27 INTERTECHNOLOGY, INC.; SAMSUNG                            )
   ELECTRO-MECHANICS; SAMSUNG                                )
28 ELECTRO-MECHANICS AMERICA, INC.;                          )

1  **ROHM CO., LTD.; and ROHM**                                    )
2  **SEMICONDUCTOR U.S.A., LLC;**                                  )
   **and DOES 1 through 100 inclusive,**                           )
3                                                                   )
                              *Defendants.*                         )
4                                                                   )

ANTITRUST CLASS ACTION COMPLAINT

Plaintiffs bring this action individually, and on behalf of a class of all persons and entities similarly situated (the "Class"), for nationwide injunctive relief under the antitrust laws of the United States and for damages under the antitrust, unfair trade practice, unfair competition and consumer protection laws of various states against the Defendants Panasonic Corporation; Panasonic Corporation of North America; Sanyo Electric Group, Ltd.; Sanyo Electronic Device (U.S.A.) Corporation; Taiyo Yuden Co., Ltd.; Taiyo Yuden (USA) Inc.; NEC Tokin Corporation; NEC Tokin America, Inc.; KEMET Corporation; KEMET Electronics Corporation; Nippon Chemi-Con Corporation; United Chemi-Con Corporation; Hitachi Chemical Co., Ltd..; Hitachi Chemical Company America, Ltd.; Nichicon Corporation; Nichicon (America) Corporation; AVX Corporation; Rubycon Corporation; Rubycon America Inc.; Elna Co., Ltd.; Elna America Inc.; Matsuo Electric Co., Ltd.; Toshin Kogyo Co., Ltd.; Vishay Intertechnology, Inc.; Samsung Electro-Mechanics; Samsung Electro-Mechanics America, Inc.; ROHM Co., Ltd.; and ROHM Semiconductor U.S.A., LLC; and Does 1 through 100, inclusive (together, the "Defendants"). Plaintiffs allege facts regarding themselves based on personal knowledge, and on information and belief, as to all other factual allegations, as follows:

## NATURE OF THE ACTION

1.      This civil antitrust action seeks damages under state antitrust, unfair trade, unfair competition and consumer protection laws and injunctive relief for the collusive and concerted restraint of trade in Aluminum and tantalum electrolytic capacitors orchestrated by the Defendants—all of whom are leading manufacturers and direct competitors in the global capacitors industry—during a period spanning from at least January 1, 2005, to present (the "Class Period").  Aluminum and tantalum electrolytic capacitors are necessary components for electronic products that are identifiable, discrete physical component objects, which do not change form or become an indistinguishable part of the particular product in which they are contained.  Therefore, Aluminum and tantalum capacitors follow a specific traceable, physical chain directly from the Defendants through direct purchasers through distribution to the indirect purchasers of the electronic products, which contain the Aluminum and tantalum capacitors.  The capacitors are separate, removable and readily identifiable parts within the electronic products

1    and are marked by electronic markers, or readily identifiable characteristics typically associated

2    with a particular Defendant manufacturer.

3          2.      Capacitors are one of the fundamental components found in electrical circuits.

4    Capacitors are passive electronic components that store, filter and regulate electrical energy and

5    current flow, but do not actually provide an electrical charge to a circuit. All electronic devices

6    we use today, from the cheapest household appliances to our personal computers to multi-million

7    dollar machinery and vehicles, employ various electrical circuits working in concert to perform

8    the various tasks for which we use them. By electrical current flowing through a circuit, the path

9    for which is usually defined by a printed circuit board ("PCB"), electronic signals can be

10   amplified, simple and complex computations can be performed, data can be moved from one

11   place to another, and the myriad other tasks that make our electronic devices perform can be

12   executed.

13         3.      All capacitors have the same basic, physical and easily identifiable structure.

14   Two parallel metal electrode plates are separated by a non-conducting dielectric (*i.e.*, the

15   insulating material in the capacitor that allows it to hold a charge). When a capacitor is

16   connected to a power source, an electric field develops across the dielectric, causing a positive

17   charge to collect on one plate and a negative charge to collect on the other plate. Without the

18   flow of electrical current, electronic circuit boards, as well as the devices that contain them, will

19   not work. Accordingly, circuits must not only have a source for current, but also means for

20   storing and regulating the flow of that current. While either a battery or a connection to an

21   external power supply typically provides current to a circuit, capacitors are separate, passive and

22   integrated into electrical circuits primarily to store charge and govern electrical flow so that the

23   tasks and applications we ask of our electrical devices, such as computers, audio receivers,

24   televisions, smartphones, MP3 players, digital cameras, automotive engine control units,

25   entertainment systems, etc., have sufficiently available and immediately dischargeable electrical

26   charge to perform when commanded to do so. Capacitors can store electric charges for long

27   periods of time and retain the electric charge even when disconnected from a power source.

28

ANTITRUST CLASS ACTION COMPLAINT

4.      Capacitors are ubiquitous and omnipresent components in the electronic devices we use.  Capacitors have a set of distinguishable characteristics and properties that make them suitable for certain applications in electronic products and electronic settings.   Electronic products contain at least one capacitor, but often contain numerous capacitors.   An average smartphone, for example, employs hundreds of capacitors of varying capacitance (*i.e.*, the potential amount of charge a capacitor can store), dielectric (*i.e.*, the insulating material in the capacitor that allows it to hold a charge) and form factors (*i.e.*, size and shape). Computers can contain hundreds of capacitors mounted on motherboards. Most modern automobiles also use hundreds of capacitors in their onboard electrical, navigation, entertainment and diagnostic systems.

5.      As society's dependence on technology has grown, so too has the demand of electronic device manufacturers for the components necessary to produce their innovative products. Given that capacitors are fundamental to the operation of practically all electronic devices, it is not surprising that the market for capacitors is big business. Indeed, recent reports indicate that global revenues for all manufacturers in the capacitor industry in 2013 totaled approximately $16 billion based on the sales of trillions of capacitors, and industry analysts estimate that global revenues will reach over $18 billion for the fiscal year 2014 and over $20 billion by 2016. These numbers are extraordinary, especially when the average price per unit for capacitors over the last five years has been $0.01178, or $11.78 per thousand units.

6.      The multi-billion dollar market for capacitors, however, is one susceptible to anticompetitive manipulation. Capacitors are particularly subjective and sensitive to price-fixing because of the existing, captive market.  The unlawful conspiracy affected prices of individual electrolytic capacitors, in addition to the products contained the incorporated capacitors.  Given the significantly high barriers to entering the already mature capacitors manufacturing industry and achieving the large volume of sales required to reach economies of scale and profitability, the global capacitors market is dominated by a limited number of large manufacturers. This is especially true in the market for Aluminum and tantalum electrolytic capacitors. The fact that these supposed competitors (specifically the Defendants named herein) sell mutually

ANTITRUST CLASS ACTION COMPLAINT

interchangeable commoditized products and adjust the prices and market availability of their products in concert indicate that true competition in the capacitors market has been foreclosed and that pricing of individual, discrete electrolytic capacitors can be manipulated by the Defendants, thus, increasing the price of the separate component and, ultimately, passed on the distribution chain to the final electronic product purchased by consumers.

7. Generally speaking, capacitors of like capacitance, dielectric and form factor are mutually interchangeable. Price is thus the most obvious differentiation among these products for purchasers. Accordingly, any agreement among manufacturers to fix, raise, maintain or stabilize prices on Aluminum and tantalum electrolytic capacitors or to reduce their market availability without justification, reduces or even negates price competition to the detriment of purchasers.

8. The threat of anticompetitive manipulation in the Aluminum and tantalum electrolytic capacitors market is not a hypothetical concern. Rather, the threat has become reality due to the actions of Defendants, who, as the leading global manufacturers of these types of electrolytic capacitors, have collusively and concertedly manipulated price competition for capacitors directed to both U.S. and international purchasers over nearly a decade. Indeed, after many years of active concealment, Defendants' anticompetitive acts recently have drawn the attention of law enforcement and regulatory agencies in the United States, the People's Republic of China, Japan, South Korea, Taiwan and Europe, all of which opened investigations earlier this year. At least one capacitor manufacturer, believed to be Defendant Panasonic, has self-reported its unlawful price fixing and is cooperating with authorities in at least the United States and China in exchange for amnesty from prosecution, and has disclosed background details regarding the cartel's membership and the scope of Defendants' conspiracy.

9. Defendants formed, maintained, enforced and concealed a global cartel. Defendants took these unlawful steps because demand for their Aluminum and tantalum electrolytic capacitor product lines began to wane in the early 2000s. While Aluminum electrolytic capacitors have been relied upon by electronics manufacturers for decades, and used in products such as televisions, stereos, and desktop computers, they tend to be bulky in size and shape relative to other capacitors and are limited in the amount of capacitance they can provide

at smaller sizes. In other words, they lack "volumetric efficiency." As technology has advanced in the last decade toward smaller, more portable and multifunctional devices—e.g., from desktop computers to tablets and smartphones, or from stereos to personal music devices—many electronics manufacturers could no longer afford to provide Aluminum electrolytic capacitors a footprint on the PCBs in their streamlined and compact products.

10.     Tantalum capacitors have significantly better volumetric efficiency than Aluminum capacitors because of tantalum's natural non-conductive properties and its thinner dielectric, as well as the ability of manufacturers to produce very small tantalum capacitors with high capacitance. But making these capacitors is expensive; it is a labor- and resource-intensive process. Even without Defendants' anticompetitive acts, tantalum electrolytic capacitors are more expensive than other capacitors. Further, due to certain of their physical properties, tantalum capacitors can short circuit and catch fire if subjected to voltage spikes only slightly more than their rated capacitance value, at times destroying the devices in which they are installed.

11.     Since at least early 2000s, Defendants have been faced with declining demand for and profits from the sale of their Aluminum and tantalum electrolytic capacitor product portfolios. Nonetheless, there remains a sizeable market for these capacitors. Industry analysts report that global revenues for Aluminum and tantalum electrolytic capacitors were approximately $5.74 billion for fiscal year 2013, though this was approximately a $570 million drop from 2012 and nearly a $1.1 billion drop from 2005. To slow any further decline in demand, and to ensure that sales of their respective product portfolios would remain profitable, Defendants agreed that price competition among themselves for their mutually interchangeable Aluminum and tantalum electrolytic capacitors had to cease.

12.     For at least the last nine and a half years, Defendants conspired together by directly and indirectly communicating with each other to effectuate a scheme to control market prices of Aluminum and tantalum electrolytic capacitors directed toward and sold into the United States market. Defendants also agreed to combine and perform the various acts necessary to achieve the anticompetitive purposes of this scheme.

13.     This conspiracy was furthered and facilitated by a course of anticompetitive conduct, including agreements and understandings among Defendants to fix, raise, maintain and stabilize prices for Aluminum and tantalum electrolytic capacitors and to restrain their respective product output through extending product lead times based on false, deceptive, misleading and pretextual reasons.

14.     The conspiracy was facilitated by the cartelized nature of the Aluminum and tantalum electrolytic capacitor industry, which is dominated by and consists primarily of Defendants, who in the past held and continue to hold secret discussions, and who made agreements between and among themselves to exchange nonpublic and commercially sensitive information concerning pricing, production capacity, costs, raw materials, and distribution. From the inception of the conspiracy to date, Defendants have concealed their anticompetitive and unlawful conduct from the public, including Plaintiffs and the Class, in furtherance of the conspiracy.

15.     Defendants' cartel has been successful in achieving the anticompetitive and unlawful ends for which it was formed. Through their concerted actions, Defendants created the market conditions that made it economically feasible for all cartel members to fix, raise, maintain or stabilize artificially high prices on the capacitors they sold during the Class Period to purchasers in the United States. Defendants were effective in moderating—and even negating—the normal downward pressures on prices for capacitors caused by price competition, oversupply, reduction of demand and technological change.

16.     Defendants' anticompetitive and unlawful conduct resulted in the increase or slowed the decrease of Aluminum and tantalum capacitor prices for products sold in the United States during the Class Period. As a result, Plaintiffs and the Class paid artificially inflated prices for the capacitors they directly purchased from Defendants. By paying these inflated prices, which exceeded the amount Plaintiffs and the Class would have paid for the Aluminum and tantalum electrolytic capacitors they purchased if pricing for the capacitors had been determined by a competitive market, Plaintiffs and the Class have been injured in their business and property and continue to suffer such injuries to date as a direct and proximate result of Defendants'

actions.  The economic injury and harm is direct and traceable through the product distribution chain.  The cost of the component part comprises a substantial part of the finished product cost, which the component capacitor is inserted and which can be traced through the distribution chain.  Plaintiffs bring this action pursuant to one antitrust theory and the damages asserted by the indirect purchasers are directly traceable from the manufacturers through direct purchasers through distribution and are directly linked to the antirust theory brought in this class action lawsuit.

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

17.     Plaintiffs bring this action on behalf of themselves as well as that of the Class for equitable relief, costs of suit, and reasonable attorney's fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1), as well as any damages, including treble damages where applicable, and all equitable relief afforded them under the state laws pleaded herein.

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

19.     This Court has diversity subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which amends 28 U.S.C. § 1332, to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of plaintiff[s] is a citizen of a State different from any defendant" and the aggregated amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.  *See* 28 U.S.C. 1332(d) and (6).  Venue is proper in this judicial district pursuant to the federal Clayton Act (15 U.S.C. § 22), and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, one or more of the Defendants reside in this District, is licensed to do business in this District, or transacts business in this District and defendants were engaged in an anticompetitive conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business in this district and directly in other states throughout the United States, including this

District. In addition, the media has reported that the Antitrust Division of the United States Department of Justice ("DOJ") is conducting an investigation into the capacitors industry and that the investigation is being conducted out of the United States Attorney's Office for the District of Northern California. Based on the DOJ's past practice with regard to similar antitrust investigations, Plaintiffs believes that a federal criminal grand jury either has been or will soon be empaneled in the Northern District of California to hear the DOJ's evidence derived from this investigation and ultimately decide on whether to criminally indict any capacitors manufacturers (such as one or more of the Defendants in this antitrust class action). Accordingly, the DOJ's San Francisco-based capacitors industry investigation, and the likely empanelment of a grand jury here, are additional facts confirming the propriety of the Northern District of California as the venue for this antitrust class action.

20.     Pursuant to Civil Local Rule 3.2 (c) and (e), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because the interstate trade and commerce involved and affected by Defendants' violations of the antitrust laws action was substantially conducted with, directed to or impacted Plaintiffs and members of the Class in counties located within the Division.

## PARTIES

**Plaintiffs**

21.     *Arizona* – Plaintiff David C. Keller is an Arizona citizen residing at 10547 E. Salt Bush Drive, Scottsdale, Maricopa County, Arizona.  Plaintiff Keller purchased products in Arizona containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period.  As a result of Defendants' unlawful conduct and conspiracy, Plaintiff Keller suffered economic injury in Arizona.

22.     *Arkansas* - Plaintiff Everett Ellis is an Arkansas citizen residing at 94 Emerald Drive, Maumelle, Pulaski County, Arkansas. Plaintiff Ellis purchased products in Arkansas containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period.  As a result of Defendants' unlawful conduct and conspiracy, Plaintiff Ellis suffered economic injury in Arkansas.  Plaintiff Computing Solutions,

Inc., d/b/a Wired! By Computing Solutions, d/b/a Wired! Technology Partners ("Wired"), is an Arkansas corporation with its address in Pulaski County, Arkansas.   Plaintiff Wired purchased products in Arkansas containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period.  As a result of Defendants' unlawful conduct and conspiracy, Plaintiff Wired suffered economic injury in Arkansas.

23.   *California* - Plaintiff BHRAC, LLC, d/b/a Beverly Hills Rent-A-Car, is a Nevada limited liability company, whose principal place of business is 9732 S. Santa Monica Blvd., Beverly Hills, CA 90210, Los Angeles County, California.  Plaintiff BHRAC, LLC has locations throughout California, including the Northern District of California.  Plaintiff BHRAC, LLC purchased products in California containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period.  As a result of Defendants' unlawful conduct and conspiracy, Plaintiff BHRAC, LLC suffered economic injury in California. Plaintiff Beverly Hills Leasing LLC, is a Nevada limited liability company, whose principal place of business is Los Angeles, Los Angeles County, California.

24.   *Florida* – Plaintiff Garth Russell, M.D. is a Florida citizen residing at 5344 Woodland Lakes Drive, #325, Palm Beach Gardens, Palm Beach County, Florida.  Plaintiff Dr. Russell purchased products in Florida containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period.  As a result of Defendants' unlawful conduct and conspiracy, Plaintiff Dr. Russell suffered economic injury in Florida.

25.   *Hawaii* – Plaintiff Timothy Duffy is a Hawaii citizen residing at Kapaa, Kanai County, Hawaii. Plaintiff Duffy purchased products in Hawaii containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period. As a result of Defendants' unlawful conduct and conspiracy, Plaintiff Duffy suffered economic injury in Hawaii.

26.   *Iowa* – Plaintiff Todd Stowater is an Iowa citizen residing at 120 North Thorington Street, Algona, Kossuth County, Iowa. Plaintiff Stowater purchased products in Iowa containing Aluminum and tantalum electrolytic capacitors indirectly from one or more

Defendants during the Class Period. As a result of Defendants' unlawful conduct and conspiracy, Plaintiff Stowater suffered economic injury in Iowa.

27. *Kansas* – Plaintiff Jamie Thaemert is a Kansas citizen residing at 7814 Conser Street, Overland Park, Johnson County, Kansas. Plaintiff Thaemert purchased products in Kansas containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period. As a result of Defendants' unlawful conduct and conspiracy, Plaintiff Thaemert suffered economic injury in Kansas.

28. *Michigan* - Plaintiffs Charles and Jennifer Rusher are Michigan citizens residing at 194 Shinnecock Drive, Brighton, Livingston County, Michigan. Plaintiffs purchased products in Michigan containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period. As a result of Defendants' unlawful conduct and conspiracy, Plaintiffs suffered economic injury in Michigan.

29. *Minnesota* - Plaintiff Mike Fisher is a Minnesota citizen residing at 12808 Kohler Lane, Audubon, Becker County, Minnesota. Plaintiff Fisher purchased products in Minnesota containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period. As a result of Defendants' unlawful conduct and conspiracy, Plaintiff Fisher suffered economic injury in Minnesota.

30. *Mississippi* – Plaintiff John E. McDowell is a Mississippi citizen residing at 267 Higginbotham Drive, Waterford, Marshall County, Mississippi. Plaintiff McDowell purchased products in Mississippi containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period. As a result of Defendants' unlawful conduct and conspiracy, Plaintiff McDowell suffered economic injury in Mississippi.

31. *Missouri* - Plaintiff Scott Huffman is a Missouri citizen residing at 16208 E. 23rd Street, Independence, Jackson County, Missouri. Plaintiff Huffman purchased products in Missouri containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period. As a result of Defendants' unlawful, unfair and fraudulent conduct and deceptive and fraudulent conspiracy, Plaintiff Huffman suffered economic injury in Missouri. Plaintiff Midwest Audio Corporation is a corporation located at 16208 E. 23rd Street, Independence,

Jackson County, Missouri.  Plaintiff Midwest Audio Corporation purchased products in Missouri containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period.  As a result of Defendants' unlawful, unfair and fraudulent conduct and deceptive and fraudulent conspiracy, Plaintiff Midwest Audio Corporation suffered economic injury in Missouri.

32.    *Nebraska* - Plaintiff Troy Gibson is a Nebraska citizen residing at 5073 S. 174th Street, Omaha, Douglas County, Nebraska.  Plaintiff Gibson purchased products in Nebraska containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period.  As a result of Defendants' unlawful conduct and conspiracy, Plaintiff Gibson suffered economic injury in Nebraska.

33.    *Nevada* – Plaintiff BHRAC, LLC is a Nevada limited liability company, whose branch business address is 3566 Polaris Avenue, Las Vegas, Clark County, Nevada.  Plaintiff BHRAC, LLC purchased products in Nevada containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period.  As a result of Defendants' unlawful conduct and conspiracy, Plaintiff BHRAC, LLC suffered economic injury in Nevada.  Plaintiff Beverly Hills Leasing LLC, is a Nevada limited liability company, whose principal place of business is Los Angeles, Los Angeles County, California.

34.    *New Mexico* - Plaintiff David Standridge is a New Mexico citizen residing at 1516 San Pedro Drive NE, Albuquerque, Bernalillo County, New Mexico.  Plaintiff Standridge purchased products in New Mexico containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period.  As a result of Defendants' unlawful conduct and conspiracy, Plaintiff Standridge suffered economic injury in New Mexico.

35.    *New York* - Plaintiff Marta Michaud is a New York citizen residing at 249 1/2 East 13 Street New York, New York County, New York.  Plaintiff Michaud purchased products in New York containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period.  As a result of Defendants' unlawful conduct and conspiracy, Plaintiff Michaud suffered economic injury in New York.

36.     *North Carolina* - Plaintiff Scot Dunlap is a North Carolina citizen residing at 511 Bilyeu Street, Raleigh, Wake County, North Carolina.  Plaintiff Dunlap purchased products in North Carolina containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period.  As a result of Defendants' unlawful conduct and conspiracy, Plaintiff Dunlap suffered economic injury in North Carolina.

37.     *North Dakota* - Plaintiff Jane Schmit is a North Dakota citizen residing at 4259 Coventry Drive South, Fargo, Cass County, North Dakota.  Plaintiff Schmit purchased products in North Dakota containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period.  As a result of Defendants' unlawful conduct and conspiracy, Plaintiff Schmit suffered economic injury in North Dakota.

38.     *Oregon* - Plaintiff Sean G. Tarjoto is an Oregon citizen residing at 10612 SW Adele Drive, Portland, Oregon.  Plaintiff Tarjoto purchased products in Oregon containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period.  As a result of Defendants' unlawful conduct and conspiracy, Plaintiff Tarjoto suffered economic injury in Oregon.

39.     *Tennessee* – Plaintiff Johnny Walker is a Tennessee citizen residing at 3335 Kenbridge Drive, Bartlett, Tennessee, Shelby County.  Plaintiff Walker purchased products in Tennessee containing Aluminum and tantalum electrolytic capacitors indirectly and from one or more Defendants during the Class Period.  As a result of Defendants' unlawful conduct and conspiracy, Plaintiff Walker suffered economic injury in Tennessee.  Plaintiff Cetacea Sound, Inc. is a Tennessee business with its principal place of business at 2950 Airways Blvd, Memphis, Shelby County, Tennessee.  Plaintiff Cetacea Sound, Inc. purchased products in Tennessee containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period.  As a result of Defendants' unlawful conduct and conspiracy, Plaintiff Cetacea Sound, Inc. suffered economic injury in Tennessee.  Plaintiff Gossett Motor Cars, Inc., is a Delaware corporation, registered to do business in Tennessee, with its principal place of business at 1900 Covington Pike Road, Memphis, Shelby County, Tennessee.  Plaintiff Gossett Motor Cars, Inc. purchased products in Tennessee containing

Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period.  As a result of Defendants' unlawful conduct and conspiracy, Plaintiff Gossett Motor Cars, Inc. suffered economic injury in Tennessee.  Plaintiff Gossett Motor Cars, Inc., does business under the following assumed names and locations:

Gossett Fiat of Memphis, 2670 Germantown Parkway, Memphis, Tennessee;

Gossett Kia, 1900 Covington Pike Road, Memphis, Tennessee;

Gossett Mazda, 1870 Covington Pike Road, Memphis, Tennessee;

Gossett Hyundai, 1870 Covington Pike Road, Memphis, Tennessee;

Gossett Mitsubishi, 1870 Covington Pike Road, Memphis, Tennessee;

Gossett Audi, 1875 Covington Pike Road, Memphis, Tennessee;

Gossett Volkswagen, 1875 Covington Pike Road, Memphis, Tennessee;

Gossett Porsche, 1875 Covington Pike Road, Memphis, Tennessee;

Gossett Chrysler/Jeep/Dodge, 1901 Covington Pike Road, Memphis, Tennessee.

40.     Plaintiff Gossett Motor Cars, Inc. conducts business throughout several states where it sells cars and trucks affected by the unlawful price-fixing conspiracy alleged herein and where it paid an unlawful overcharge for cars and trucks, where were subject to the unlawful conspiracy, combination and trust alleged herein.

41.     Plaintiff Gossett Motor Cars, Inc. purchases and sells various types of foreign vehicles and relies heavily on lower pricing of the cars and trucks to maintain its business and keep automobiles affordable for consumers in Tennessee.  Plaintiff paid an artificial overcharge and suffered economic injury by purchasing products (automobiles and trucks), which were subject to Defendant's unlawful conspiracy, combination and trust, in violation of Tennessee law, and which substantially affected the entire economy and Tennessee marketplace.  This unlawful conspiracy, which substantially affected and impacted products sold in Tennessee, was concealed, suppressed and hidden from Plaintiffs during all relevant times herein.

42.     WE 3 Gossett LLC, is a domestic limited liability corporation organized under the laws of the State of Tennessee, with its principal place of business located at 1875 Covington Pike Road, Memphis, Shelby County, Tennessee.  Plaintiff WE 3 Gossett LLC, does business in

Tennessee under the following assumed names at the following locations:

Gossett Fiat, 1875 Covington Pike Road, Memphis, Tennessee;

Gossett Volkswagen of Germantown, 7420 Winchester Road, Germantown, Tennessee;

Gossett Kia South, 2660 Mt. Moriah Road, Memphis, Tennessee;

Gossett Hyundai South, 2680 Mt. Moriah Road, Memphis, Tennessee.

43.     Plaintiff WE 3 Gossett, LLC purchases and sells various types of foreign vehicles and relies heavily on lower pricing of the cars and trucks to maintain its business and keep automobiles affordable for consumers in Tennessee.  Plaintiff WE 3 Gossett, LLC paid an overcharge and suffered economic injury by purchasing products (automobiles and trucks), which were subject to Defendant's unlawful conspiracy, combination and trust, in violation of Tennessee law, and which substantially affected the entire economy and Tennessee marketplace. This unlawful conspiracy, which substantially affected and impacted products sold in Tennessee, was concealed, suppressed and hidden from Plaintiffs during all relevant times herein.

44.     Plaintiff Autorama, Inc. is a domestic corporation organized under the laws of the State of Tennessee, doing business in Tennessee under the assumed name of Mercedes-Benz of Memphis, at its principal place of business at 5389 Poplar Avenue, Memphis, Tennessee. Plaintiff Autorama, Inc. purchases and sells various types of foreign vehicles and relies heavily on lower pricing of the cars and trucks to maintain its business and keep automobiles affordable for consumers in Tennessee.  Plaintiff Autorama, Inc. paid an overcharge and suffered economic injury by purchasing products (automobiles and trucks), which were subject to Defendant's unlawful conspiracy, combination and trust, in violation of Tennessee law, and which substantially affected the entire economy and Tennessee marketplace.  This unlawful conspiracy, which substantially affected and impacted products sold in Tennessee, was concealed, suppressed and hidden from Plaintiffs during all relevant times herein.

45.     *Vermont* - Plaintiff Fredrick P. Hege, Jr., is a Vermont citizen residing at 286 Sawdust Alley, Townshend, Windham County, Vermont.  Plaintiff Hege purchased products in Vermont containing Aluminum and tantalum electrolytic capacitors indirectly from one or more

Defendants during the Class Period.   As a result of Defendants' unlawful conduct and conspiracy, Plaintiff Hege suffered economic injury in Vermont.

46.   *West Virginia* - Plaintiff Michael W. Davis is a West Virginia citizen residing at 310 Ernest Way, Kanawha County, Charleston, West Virginia.   Plaintiff Davis purchased products in West Virginia containing Aluminum and tantalum electrolytic capacitors indirectly from one or more Defendants during the Class Period.   As a result of Defendants' unlawful conduct and conspiracy, Plaintiff Davis suffered economic injury in West Virginia.

**Defendants**

**1. Panasonic and Sanyo**

47.   Defendant Panasonic Corporation is a Japanese corporation with its principal place of business located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. Until October 1, 2008, Panasonic Corporation operated under the name of Matsushita Electric Industrial Co., Ltd. During the Class Period, Panasonic Corporation manufactured, sold and distributed Aluminum and tantalum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

48.   Defendant Panasonic Corporation of North America, a wholly owned subsidiary of Panasonic Corporation, is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, Newark, New Jersey 07102. During the Class Period, Panasonic Corporation of North America sold and distributed Aluminum and tantalum electrolytic capacitors to customers throughout the United States.

49.   Defendant Sanyo Electric Group, Ltd., a Japanese corporation, is, as of December 2009, a wholly owned subsidiary of Panasonic Corporation, with its principal place of business located at 15-5, Keihan-Hondori, 2-Chome, Moriguchi City, Osaka 570-8677, Japan. During the Class Period, Sanyo Electric Group, Ltd., manufactured, sold and distributed Aluminum tantalum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

50.   Defendant Sanyo Electronic Device (U.S.A.) Corporation, a Delaware corporation, is a wholly owned subsidiary of Sanyo Electric Group, Ltd., with its principal place

of business located at 2055 Sanyo Avenue, San Diego, California 92154. During the Class Period, Sanyo Electronic Device (U.S.A.) Corporation sold and distributed tantalum electrolytic capacitors to customers throughout the United States.

51.     Defendants Panasonic Corporation, Panasonic Corporation of North America, Sanyo Electric Group, Ltd., and Sanyo Electronic Device (U.S.A.) Corporation are collectively referred to herein as "Panasonic." With regard to any allegations pertaining to Sanyo Electric Group, Ltd. And Sanyo Electric Device (U.S.A.) Corporation prior to their acquisition by Panasonic, they are referred to herein as "Sanyo."

**2. Taiyo Yuden**

52.     Defendant Taiyo Yuden Co., Ltd., is a Japanese corporation with its principal place of business located at 6-16-20, Ueno, Taito-ku, Tokyo 110-0005, Japan. During the Class Period, Taiyo Yuden Co., Ltd., manufactured, sold and distributed tantalum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

53.     Defendant Taiyo Yuden (USA) Inc., an Illinois corporation, is a wholly owned subsidiary of Taiyo Yuden Co., Ltd., with its principal place of business located at 10 North Martingale Road, Suite 575, Schaumburg, Illinois 60173. During the Class Period, Taiyo Yuden (USA) Inc. sold and distributed Aluminum and/or tantalum electrolytic capacitors to customers throughout the United States.

54.     Defendants Taiyo Yuden Co., Ltd., and Taiyo Yuden (USA) Inc. are collectively referred to herein as "Taiyo Yuden."

**3. NEC Tokin**

55.     Defendant NEC Tokin Corporation is a Japanese company with its principal place of business located at 7-1, Kohriyama 6-chome, Taihaku-ku, Sendai-shi, Miyagi 982-8510, Japan. During the Class Period, NEC Tokin Corporation manufactured, sold, and distributed Aluminum and/or tantalum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates throughout the United States.

56.     Defendant NEC Tokin America, Inc., a California Corporation, is a wholly owned subsidiary of NEC Tokin Corporation with its principal place of business located at 2460 North First Street, Suite 220, San Jose, California 95131. During the Class Period, NEC Tokin America, Inc., sold and distributed Aluminum and/or tantalum electrolytic capacitors throughout the United States.

57.     Defendants NEC Tokin Corporation and NEC Tokin America, Inc., are together referred to herein as "NEC Tokin."

**4. KEMET**

58.     Defendant KEMET Corporation is a Delaware corporation with its principal place of business located at 2835 Kemet Way, Simpsonville, South Carolina 29681. During the Class Period, KEMET Corporation manufactured, sold and distributed Aluminum and tantalum electrolytic capacitors directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

59.     On March 12, 2012, KEMET Corporation announced that it agreed to form a capital and business alliance with NEC Tokin Corporation because of their respective professed interests in increasing its tantalum electrolytic capacitor sales, reducing costs in areas such as procurement and production, sharing their technological knowledge, and benefiting financially through the cross-selling of each other's products. As a result of this alliance, KEMET received 34% of the outstanding shares of NEC Tokin (the remainder being held by non-party NEC Corporation), which provided KEMET with 51% of the outstanding voting rights. KEMET currently holds the option to purchase NEC Corporation's shares in NEC Tokin, which would thereby effect an acquisition of NEC Tokin by KEMET.

60.     Defendant KEMET Electronics Corporation, a Delaware corporation, is a wholly owned subsidiary of KEMET Corporation with its principal place of business located at 2835 Kemet Way, Simpsonville, South Carolina 29681. During the Class Period, KEMET Electronics Corporation manufactured, sold and distributed Aluminum and tantalum electrolytic capacitors directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

ANTITRUST CLASS ACTION COMPLAINT

61.     Defendants KEMET Corporation and KEMET Electronics Corporation are together referred to herein as "KEMET." The KEMET-NEC Tokin alliance shall be referred to herein as "KEMET-NEC Tokin."

**5. Nippon Chemi-Con**

62.     Defendant Nippon Chemi-Con Corporation is a Japanese corporation with its principal place of business located at 5-6-4, Osaki, Shinagawa-ku, Tokyo 141-8605, Japan. During the Class Period, Nippon Chemi-Con Corporation manufactured, sold, and distributed Aluminum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

63.     Defendant United Chemi-Con Corporation, an Illinois Corporation, is a wholly owned subsidiary of Nippon Chemi-Con Corporation with its principal place of business located at 9801 West Higgins Road, Rosemont, Illinois 60018. During the Class Period, United Chemi-Con manufactured, sold and distributed Aluminum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

64.     Defendants Nippon Chemi-Con Corporation and United Chemi-Con Corporation are together referred to herein as "Nippon Chemi-Con."

**6. Hitachi Chemical**

65.     Defendant Hitachi Chemical Co., Ltd., is a Japanese corporation with its principal place of business located at Grantokyo South Tower, 1-9-2, Marunouchi, Chiyoda-ku, Tokyo, 100-6606, Japan. During the Class Period, Hitachi Chemical Co., Ltd., manufactured, sold, and distributed Aluminum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

66.     Defendants Hitachi Chemical Company America, Ltd., a New York corporation, is a wholly owned subsidiary of Hitachi Chemical Co., Ltd. with its principal place of business located at 10080 North Wolfe Road, Suite SW3-200, Cupertino, California 95014. During the Class Period, Hitachi Chemical Co. America sold and distributed Aluminum electrolytic capacitors to customers throughout the United States.

67.     Defendants Hitachi Chemical Co., Ltd. and Hitachi Chemical Company America, Ltd. are together referred to herein as "Hitachi."

**7. Nichicon**

68.     Defendant Nichicon Corporation is a Japanese corporation with its principal place of business located at Karasumadori Oike-agaru, Nakagyo-ku, Kyoto, 604-0845 Japan. During the Class Period and until the company's sale of its tantalum capacitor production operations to AVX Corporation in February 2013, Nichicon Corporation manufactured, sold, and distributed tantalum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States. During the entire Class Period, Nichicon Corporation manufactured, sold and distributed Aluminum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

69.     Defendant Nichicon (America) Corporation, an Illinois corporation, is a wholly owned subsidiary of Nichicon Corporation with its principal place of business located at 927 East State Parkway, Schaumburg, Illinois 60173. During the Class Period and until Nichicon Corporation's sale of its tantalum capacitor production operations to AVX Corporation in February 2013, Nichicon (America) Corporation sold, and distributed tantalum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States. During the entire Class Period, Nichicon (America) Corporation sold and distributed Aluminum electrolytic capacitors to customers throughout the United States.

70.     Defendants Nichicon Corporation and Nichicon (America) Corporation are together referred to herein as "Nichicon."

**8. AVX**

71.     Defendant AVX Corporation is a Delaware Corporation with its principal place of business located at One AVX Boulevard, Fountain Inn, South Carolina 29644. It is a subsidiary of Kyocera Corporation, a Japanese corporation that owns approximately 72% of the outstanding common stock in AVX Corporation. In or about February 2013, AVX acquired Nichicon's tantalum capacitor production facilities in Japan and China, thereby expanding their global tantalum capacitor manufacturing operations. During the Class Period, AVX Corporation

manufactured, sold and distributed tantalum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

72.     Defendant AVX Corporation is referred to herein as "AVX."

**9. Rubycon**

73.     Defendant Rubycon Corporation is a Japanese corporation with its principal place of business located at 1938-1, Nishi-Minowa, Ina-City, Nagano 399-4593, Japan. During the Class Period, Rubycon Corporation manufactured, sold, and distributed Aluminum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

74.     Defendant Rubycon America Inc., an Illinois corporation, is a wholly owned subsidiary of Rubycon Corporation with its principal place of business located at 4293 Lee Avenue, Gurnee, Illinois 60031. During the Class Period, Rubycon America Inc. sold and distributed Aluminum electrolytic capacitors to customers throughout the United States.

75.     Defendants Rubycon Corporation and Rubycon America Inc. are together referred to herein as "Rubycon."

**10. Elna**

76.     Defendant Elna Co., Ltd., is a Japanese corporation with its principal place of business located at 3-8-11 Shin-Yokohama, Kohoku-ku, Yokohama, Kanagawa Prefecture, 222-0033, Japan. During the Class Period, Elna Co., Ltd., manufactured, sold, and distributed Aluminum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

77.     Defendant Elna America Inc., a California corporation, is a wholly owned subsidiary of Elna Co., Ltd., with its principal place of business located at 879 West 190th Street, Suite 100, Gardena, California 90248. During the Class Period, Elna America Inc. sold and distributed Aluminum electrolytic capacitors to customers throughout the United States.

78.     Defendants Elna Co., Ltd., and Elna America Inc. are together referred to herein as "Elna."

**11. Matsuo**

79.    Defendant Matsuo Electric Co., Ltd., is a Japanese corporation with its principal place of business located at 3-5- Sennari-cho, Toyonaka-shi, Osaka 561-8558, Japan. During the Class Period, Matsuo Electric Co., Ltd., manufactured, sold and distributed Aluminum and tantalum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States. Matsuo Electric Co., Ltd., is referred to herein as "Matsuo."

**12. Toshin Kogyo**

80.    Defendant Toshin Kogyo Co., Ltd., is a Japanese corporation with its principal place of business at Tsukasa Bldg. 2-15-4, Uchikanda Chiyoda-ku, Tokyo, Japan. During the Class Period, Toshin Kogyo Co., Ltd., manufactured, sold, and distributed Aluminum and tantalum electrolytic capacitor products either directly or through its subsidiaries or affiliates throughout the United States. Toshin Kogyo Co., Ltd., is referred to herein as "Toshin Kogyo."

**13. Vishay**

81.    Defendant Vishay Intertechnology, Inc., is a Delaware corporation with its principal place of business located at 63 Lancaster Avenue, Malvern, Pennsylvania 19355. During the Class Period, Vishay Intertechnology, Inc., manufactured, sold, and distributed Aluminum and tantalum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States. Vishay Intertechnology, Inc., is referred to herein as "Vishay."

**14. SEMCO**

82.    Defendant Samsung Electro-Mechanics is a South Korean corporation with its principal place of business located at Gyeonggi-Do Suwon-Si Youngtong-Gu Maeyoung-Ro 150 (Maetan-Dong) 443-743, South Korea. It is a wholly-owned subsidiary of Samsung Group, a South Korean *chaebol* (*i.e.*, a business conglomerate). During the Class Period, Samsung Electro-Mechanics manufactured, sold, and distributed tantalum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

83.     Defendant Samsung Electro-Mechanics America, Inc., a California corporation, is a subsidiary of Samsung Electro-Mechanics with its principal place of business located at 3333 Michelson Drive, Suite 500, Irvine, California 92612. During the Class Period, Samsung Electro-Mechanics America, Inc., sold and distributed tantalum electrolytic capacitors to customers throughout the United States.

84.     Defendants Samsung Electro-Mechanics and Samsung Electro-Mechanics America, Inc., are together referred to herein as "SEMCO."

**15. ROHM**

85.     Defendant ROHM Co., Ltd., is a Japanese corporation with its principal place of business located at 21 Saiin Mizosaki-cho, Ukyo-ku, Kyoto 615-8585 Japan. During the Class Period, ROHM Co., Ltd. manufactured, sold, and distributed tantalum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

86.     Defendant ROHM Semiconductor U.S.A., LLC, a Delaware limited liability corporation, is a subsidiary of ROHM Co., Ltd. with its principal place of business located at 2323 Owen Street, Suite 150, Santa Clara. California 95054. During the Class Period, ROHM Semiconductor U.S.A., LLC, sold and distributed tantalum electrolytic capacitors to customers throughout the United States.

87.     Defendants ROHM Co., Ltd., and ROHM Semiconductor U.S.A., LLC, are together referred to herein as "ROHM."

**16. DOES 1 through 100**

88.     Plaintiffs are informed, believe, and thereon allege that DOES 1 through 100 manufactured, sold or distributed Aluminum and tantalum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States. Plaintiffs will seek leave of Court to replace the fictitious names of these entities with their true names when they are discovered.

89.     The true names and capacities of Defendants DOES 1 through 100 are unknown to Plaintiffs at this time, and Plaintiffs therefore sue said Defendants by such fictitious names.

Plaintiffs allege, on information and belief, that each DOE defendant is responsible for the actions herein alleged. Plaintiffs will seek leave of Court to amend this Complaint when the names of said Doe defendants have been ascertained, or when the facts concerning their liability have been ascertained, or as otherwise permitted by the Court.

90.     Collectively, the Defendants are referred to hereinafter as "Defendants."

## AGENTS AND CO-CONSPIRATORS

91.     The anticompetitive, unfair, false, deceptive, unconscionable and unlawful acts alleged against the Defendants in this class action complaint were authorized, ordered or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

92.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

93.     Each Defendant acted as the principal, agent or joint venturer of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein. In particular, each Defendant headquartered outside the United States relied on their agents in the United States to implement, enforce and conceal the cartel through their global sales and marketing systems and actively participated in the United States in concealing unlawful information from being discovered by the Plaintiffs.

## TRADE AND COMMERCE

94.     During the Class Period, each Defendant, directly or through one or more of their respective parents, subsidiaries, agents or affiliates, sold Aluminum and/or tantalum electrolytic capacitors in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

95.     During the Class Period, Defendants collectively controlled the market for Aluminum and tantalum electrolytic capacitors, both globally and also in the United States.

96.     Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States to Plaintiffs and members of the Class.

## FACTUAL ALLEGATIONS

## I.     WHAT CAPACITORS DO AND HOW THEY WORK

97.     Capacitors are electronic components that serve as one of the fundamental building blocks of all types of electrical circuits. Virtually every electrical circuit contains one or more capacitors. In the taxonomy of electrical components, capacitors are categorized as "passive" components. That is, capacitors do not require electrical power to operate. Instead, the physical properties of the materials that compose a passive component cause it to perform the task for which it is employed.

98.     Generally, a capacitor is used in an electric circuit to store electrical charge. In this regard, it is distinguished from a battery in that a battery provides electrical charge to a circuit. Capacitors can store charges for long periods of time, even when removed from an electric circuit, and they can charge and discharge fully and instantaneously when required to do so. The amount of charge the capacitor can hold at a given voltage defines its capacitance.

99.     In its basic form, a capacitor consists of two or more parallel conductive metal plates that are neither connected to nor touching each other, but are electrically separated by some form of insulating material. The insulating layer between a capacitor's plates is commonly called the dielectric. When a voltage is applied to the two plates, an electric field is created between them; positive charge will collect on one plate and negative charge on the other. The dielectric, a non-conductive material, does not permit the electric current to flow between the metal plates.

100.    One way to visualize how a capacitor stores a charge is to imagine it as a municipal water tower hooked into a town's water supply. A water tower "stores" water pressure—when the water system pumps produce more water than a town needs, the excess is stored in the water tower. Then, at times of high demand, the excess water flows out of the tower

to keep the pressure up. A capacitor stores electrical charge in the same way and can then release it when an electric circuit requires a charge to execute a task.

101.    The most commonly used dielectrics used in capacitors are composed of ceramics, Aluminum, film or a rare metal called tantalum.

## II.    TYPES OF CAPACITORS AND THEIR USES

102.    Capacitors are usually distinguished from each other by whether they are electrolytic or electrostatic. Electrolytic capacitors are polarized, meaning that they have positive and negative leads that must be positioned the correct way in an electric circuit (*i.e.*, the positive lead, the cathode, must go to the positive side of the power source, and the negative lead, or anode, must go to the negative side). In contrast, electrostatic capacitors are not polarized (*i.e.*, they do not have a positive and negative leads) and therefore can be installed in either direction with respect to the flow of current.

103.    Electrolytic capacitors have historically been considered to have higher capacitance than electrostatic capacitors. Because of their ability to hold larger charges, electrolytic capacitors have typically been used for power filtering, coupling or buffering in sophisticated electrical devices, such as televisions, computers, mobile phones, smart phones, tablets, and technology used by the medical, military industrial and aerospace industries.

104.    Electrolytic and electrostatic capacitors are further distinguished within these two categories by the material from which their dielectrics are made. Electrolytic capacitors use Aluminum or tantalum dielectrics, whereas ceramic capacitors are electrostatic. Flux capacitors are not part of this case.

### A.    Electrolytic Capacitors

#### 1.    Aluminum Capacitors

105.    Aluminum electrolytic capacitors are made of two Aluminum foils and a paper spacer soaked in electrolyte. One of the two Aluminum foils is covered with an oxide layer serving as the dielectric, and that foil acts as the anode, while the uncoated foil acts as a cathode. The anode, electrolyte-soaked paper and cathode are stacked. The stack is then wound up, placed

into a cylindrical enclosure usually made of Aluminum and connected to an electric circuit through surface mounting on PCBs or attached by radial or axial pins.

106.    The thinness of the Aluminum oxide layer dielectric allows for relatively high capacitance, though an Aluminum capacitor's capacitance can only increase by increasing the surface area covered by the dielectric. This requires additional stacking and winding of the foil layers, thus increasing the capacitors' physical size. As a result, Aluminum capacitors typically have lower volumetric efficiency than tantalum or certain types of ceramic capacitors. Further, Aluminum capacitors have a higher propensity to leak the charge they hold as opposed to tantalum and certain types of ceramic capacitors.

107.    Aluminum capacitors frequently are used in a variety of larger electronic devices, such as consumer audio and video devices, televisions, video game consoles, desktop and laptop computers, automotive electronics and power inverters.

### 2.    Tantalum Capacitors

108.    Tantalum capacitors exploit the tendency of tantalum metal to form a non-conductive protective oxide surface layer. They consist of tantalum powder sintered (*i.e.*, formed by high pressure) into a pellet shape—often called a "sponge"—as the negative plate of the capacitor, with the tantalum pentoxide forming on the pellet's surface serving as the dielectric, and an electrolytic solution or conductive solid serving as the positive plate. The dielectric layer thus can be very thin—thinner than the similar layer in, for instance, an Aluminum electrolytic capacitor. Accordingly, a tantalum capacitor can have high capacitance in a small volume, and thus can have high volumetric efficiency. Tantalum capacitors historically have primarily been used in the computer end market, as well as the telecommunications end market.

109.    Tantalum capacitors are, however, susceptible to short-circuiting or catastrophic thermal runaway failure and destruction by fire if subject to inconsistent voltage or voltage spikes, as such inconsistencies can tax and break down the capacitor's extremely thin dielectric.

110.    Aside from the risk of catastrophic failure, tantalum capacitors are generally reliable. They have high resistance to leaking charge and have lower equivalent series resistance (*i.e.*, the speed at which electric charge is released from the capacitor) than Aluminum

electrolytic capacitors of the same capacitance rating. Accordingly, tantalum capacitors at times are used in complex electronic devices in which their small size and high capacitance are required, *e.g.*, mobile phones, smart phones, personal computers, tablet devices and automotive electronics.

111. The Defendant tantalum capacitor manufacturers have, at various times over the last decade, claimed that shortages of raw tantalum ore have caused the high prices for their capacitors and the longer lead times for their production. Specifically, Defendants raised supply shock concerns to industry analysts and the investing public at various times in 1997, 2000, 2008, 2011 and 2012 based on concerns that certain tantalum mines were closing, other mines were not producing ore at the necessary levels, and the worry that tantalum's designation as a "conflict mineral" under Section 1502 of the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") would reduce their access to ore and/or would increase the market premium for conflict-free tantalum ore. Dodd-Frank requires that companies sourcing tantalum use independent private sector auditors to audit their supply chains and submit annual conflict minerals reports to the Securities and Exchange Commission.

112. The availability and cost of tantalum ore, along with the numerous steps required to manufacture tantalum capacitors, has been explained by Defendants and some industry analysts as the reason why these capacitors have historically been so expensive. As a result, the use of tantalum capacitors is usually limited to applications where the specific high capacitance they provide is required.

**B. Ceramic Electrostatic Capacitors**

113. A ceramic capacitor is a non-polarized capacitor made out of two or more alternating layers of ceramic and metal in which the ceramic material acts as the dielectric and the metal acts as the electrodes. The ceramic dielectric is a mixture of finely ground granules of paraelectric or ferroelectric materials, modified by mixed oxides that are necessary to achieve the capacitor's desired characteristics. The great plasticity of ceramic raw material enables manufacturers to produce an enormous diversity of styles, shapes and dimensions of capacitors. Because the thickness of the ceramic dielectric layer can be easily controlled and produced by

the desired application voltage, ceramic capacitors are available with rated voltages up to the 30 kV range. Currently, the smallest discrete ceramic capacitor is about the physical size of the head of a pin, though advances in materials science and refinement of manufacturing processes may eventually permit fabrication of even smaller components.

114.    The most prevalent form of ceramic capacitor is known as a multilayer ceramic capacitor ("MLCC"). Industry analysts report that for fiscal year 2014, MLCCs are estimated to account for approximately 95% of the global ceramic market in terms of volume and approximately 94% in terms of value. MLCCs are constructed with alternating layers that result in single capacitors connected in parallel. This method, called "stacking" increases the component's capacitance because its surface area is increased by stacking up multiple layers of ceramic dielectric materials and metal electrode materials.

115.    Technological and material advancements have permitted manufacturers to increase the number of layers in MLCCs while at the same time miniaturizing the components. The result of these improvements is that MLCCs tend to have higher greater volumetric efficiency than Aluminum electrolytic capacitors, and can also compete with tantalum electrolytic capacitors in small form factor applications. Both Aluminum and tantalum electrolytic capacitors, however, must increase in physical size to increase capacitance. The capacitance of Aluminum electrolytic capacitors can be increased only through tightly winding Aluminum metal foil, thereby increasing the surface area as well as the total size of the component. In similar fashion, capacitance in tantalum electrolytic capacitors is increased only by expanding the size of the tantalum pellet in the capacitor, which in turn increases the total size of the capacitor.

116.    Currently, MLCCs typically cost only a fraction of Aluminum or tantalum electrolytic capacitors. Ceramics, however, are not an easy cure for purchasers seeking to save costs on the electronic devices they produce that require high capacitance in a small form factor, *e.g.*, mobile phones, smart phones and tablet computers. Because electric circuits are designed to accommodate specific types of active and passive components with specific technical and operational characteristics, ceramic capacitors cannot immediately be integrated into PCBs or

other types of circuits that require either Aluminum or tantalum electrolytic capacitors. Stated differently, capacitors with differing capacitance, dielectric and form factor are not interchangeable with each other. Redesigning and reengineering a product's electrical circuits is therefore required to accommodate any changes to the electrical components contained within them. This is a lengthy, resource-intensive effort that requires a product manufacturer essentially to redesign a product and change and redefine its supply chain resources, all while still working to meet ongoing demand for its finished products.

## III. THE MARKET CONDITIONS IN WHICH DEFENDANTS' CONSPIRACY ORIGINATED

117. Generally, capacitors are purchased by one of three categories of purchasers: (1) original equipment manufacturers ("OEMs") who install capacitors directly into their products; (2) electronic manufacturing service providers ("EMS Providers") who manufacture PCBs and other electric circuit products that contain capacitors and which are integrated into end-use products manufactured by others; and (3) third-party electronics distributors that sell capacitors to various consumers.

118. The demand for capacitors over the last decade has been largely tied to the demand for consumer electronics, which currently accounts for approximately 90% of global unit demand. The computer end-use market segment historically has accounted for a significant portion of global capacitor consumption, but that segment has experienced decreasing sales of high-passive component content laptops and desktops in recent years. Industry analysts have indicated that declining demand for these products has negatively impacted the demand for tantalum and Aluminum capacitors, which have historically derived close to 50% of their revenues from the computer market. In addition, the consumer audio-video segment, which has also historically accounted for a significant portion of global capacitor consumption, has also faced significant decreasing sales over the last decade due to portable music devices, tablets and smart phones meeting modern consumers' audio-visual needs. The fall off of the audio-visual market had a significant impact on the demand for Aluminum electrolytic capacitors.

119. Over the past decade, ceramic electrostatic capacitors have outperformed the other primary capacitor dielectrics (specifically the tantalum and Aluminum electrolytics) in terms of volume of products globally consumed and the value of that demand. In terms of volume, industry data shows that unit consumption of ceramic capacitors over the last decade has increased 7%, from approximately 84% for fiscal year 2004 to an estimated 91% for 2014. During the same period, consumption of tantalum electrolytic capacitors dropped from approximately 2.5% of global volume for fiscal year 2004 to an estimated 1.1% for 2014, and consumption of Aluminum electrolytic capacitors dropped from approximately 9.9% for fiscal year 2004 to an estimated 6.8% for fiscal year 2014.

120. The value of the tantalum electrolytic capacitors sold over the last decade has declined from approximately 12.6% of the global value for fiscal year 2004 to an estimated 10.4% for 2014, while the global value of Aluminum electrolytic capacitors has declined from approximately 33.1% for fiscal year 2004 to an estimated 22.6% for 2014.

121. The North and South American market for capacitors accounts for approximately $2.2 billion for fiscal year 2014, or roughly 12 percent of the global market. Ceramics account for approximately 47% of capacitor consumption in the Americas, followed by Aluminum capacitors with approximately 17%, and tantalum capacitors with 14%.

122. Aluminum and tantalum electrolytic capacitor manufacturers have faced stagnant and/or reduced demand over the last decade.

123. With specific regard to Aluminum electrolytic capacitors, purchasers began to find them too volumetrically inefficient to be useful in many electronic devices sold today. Historically, most electronic devices have been larger physically than they are today. In the past, the larger footprint required by Aluminum capacitors on PCBs found in devices such as televisions, stereo equipment, and personal computers was not problematic.

124. With the development of technologies and processes that allowed manufacturers to miniaturize certain types of capacitors while, at the same time, increasing their volumetric efficiency, manufacturers of electronic devices began to design and produce smaller, more portable and more functionally integrated products that met, if not surpassed, the complexity of

33

predecessor devices that used Aluminum capacitors. For many consumer-focused devices—*e.g.*, smart phones, tablet computers, laptop computers, personal navigation devices—smaller capacitors with greater capacitance had to be used to execute the various complex tasks for which the devices were employed. Because many of these new electronic devices have essentially come to replace the devices that historically used bulky Aluminum capacitors—*e.g.*, tablets, smart phones and personal music devices replacing televisions, personal computers and stereos—the market for Aluminum electrolytic capacitors had grown relatively stagnant as of late 2004, but noticeably declined starting in late 2007 to early 2008.

125. With specific regard to tantalum electrolytic capacitors, demand declined over the last decade in large part because they were often unavailable and, as a result, expensive. Though tantalum electrolytic capacitors have a high volumetric efficiency and other operational characteristics often desired by OEMs and EMS Providers for use in small form factor applications, many purchasers over time came to expect that their demand for tantalum capacitors could not economically be met.

126. Manufacturing tantalum electrolytic capacitors is a labor- and resource-intensive process. Industry sources have noted there are over 70 steps required to be taken to manufacture a tantalum electrolytic capacitor. The manufacturing process for these capacitors is completely different from that required for making Aluminum electrolytic or even ceramic capacitors, and it requires different raw materials, supply chains and fabrication operations. Further, the limited availability of tantalum ore, especially when compared to availability of raw materials required to make other capacitors, has been claimed by tantalum capacitor manufacturers as a cause for limited production and high costs.

127. Many capacitor purchasers make products that specifically require tantalum electrolytic capacitors and the electrical circuits incorporated in these products cannot be redesigned and reengineered to use any other capacitors. As a result, these purchasers have no choice but to weather the availability and cost issues attendant to using tantalum capacitors. Other purchaser's products, however, are not solely dependent on the specific performance tantalum capacitors provide the electric circuits they employ. In those instances, purchasers over

time undertook the lengthy and resource intensive effort to redesign and reengineer the electric circuits they employ in their manufactured products to incorporate more available and affordable capacitors containing dielectrics other than tantalum. This gradual—and therefore not immediate—process accounts for much of the decrease in demand for tantalum electrolytic capacitors over at least the last decade.

128.    The decline in demand for both Aluminum and tantalum electrolytic capacitors began in early 2000s, though it became more pronounced when the global economy crashed starting in late 2007. The global financial crisis caused consumer demand at all levels—globally and domestically—to fall significantly. According to industry data, consumption for capacitors dropped nearly 10% globally between fiscal year 2008 and 2009. Though economic stimulus packages orchestrated by the United States, China and EU countries caused some growth in the volume of capacitors consumed in fiscal year 2011, global consumption still dropped year over year approximately 7% in 2012 and 14% in 2013.

129.    By the close of fiscal year 2008, global consumption for Aluminum electrolytic capacitors had already declined approximately 14% from 2005. This decline has continued to the present day, with consumption in 2014 estimated to be approximately 30% lower than it was in 2005. Similarly, by the close of fiscal year 2008, global consumption for tantalum capacitors dropped approximately 37% from 2005, and with consumption in 2014 estimated to be approximately 53% less than it was in 2005.

## IV.    DEFENDANTS' COLLUSIVE ANTICOMPETITIVE PRACTICES

130.    In the context of this marked decline in demand for Aluminum and tantalum electrolytic capacitors since at least the early 2000s, any price competition among the Defendants for the mutually interchangeable and substitutable components they produce would be sure to reduce any profitability they could hope to reap from these product markets. Specifically, given the significant costs related to running Defendants' respective capacitor manufacturing operations, keeping abreast of technological change and innovation, as well as the ongoing variable costs of raw materials, labor and distribution chain operations, Defendants' profit margins on Aluminum and tantalum electrolytic capacitors would, by the operation of basic

principles of economics, grow thinner if they were required to compete against each other for sales.

131.    At least prior to the beginning of 2005, Defendants each were aware of the significant market share each of them held, both individually and collectively, in the mature, yet declining market for Aluminum and tantalum electrolytic capacitors. Relatedly, Defendants each were also aware of the inability of capacitor manufacturers with smaller market share to successfully compete against them and meet market demand due to their evident capacity and resource constraints.

132.    Additionally, at least prior to the beginning of 2005, Defendants were aware that their Aluminum and tantalum electrolytic capacitors products of like capacitance, dielectric and form factor are in most instances mutually interchangeable for each other. For example, one manufacturer's Aluminum electrolytic capacitors of a given capacitance and form factor often can be substituted for another manufacturer's Aluminum capacitors with the same capacitance and form factors; the same goes for tantalum electrolytic capacitors produced by different manufacturers with the same capacitance and form factors. Aluminum electrolytic capacitors, however, are not mutually interchangeable with tantalum electrolytic capacitors, and vice versa.

133.    Further, Defendants were also aware of how fundamentally necessary capacitors are to the function of electric circuits, and how other types of passive electrical components (*e.g.*, inductors, resistors) cannot serve as a substitute for or a functional equivalent to an Aluminum or tantalum electrolytic capacitor.

134.    Finally, Defendants were aware that all types of purchasers—OEMs, EMS Providers and third-party distributors—were almost always committed to inflexible production or delivery deadlines to their respective customers, and therefore would incur any price increases on the capacitors they required to avoid the usually greater cost of production delays or customer dissatisfaction.

135.    In their collective and individual consideration of the market conditions, Defendants agreed to operate as a cartel to foreclose competition and protect each of its members from price competition. By forming this cartel, Defendants intended to wring as much

profitability out of the Aluminum and tantalum electrolytic capacitors market as possible before their product portfolios for these capacitors become technologically obsolete or became consigned to the comparatively unprofitable niche market.

136. Defendants together reached an agreement to concertedly fix prices and reduce output on Aluminum and tantalum electrolytic capacitors some time before, and in any event no later than, January 1, 2005. This agreement was reached through both oral and written communication among executives, officers, sales representatives and employees of the Defendant companies. The exchanges of these communications occurred in person, through electronic or paper correspondence, text messaging or telephonic or video communications in the period preceding the beginning of the Class Period.

137. The specific date upon which Defendants' cartel and their collusive behavior commenced (assuming it is even capable of determination given the nature of secret conspiracies) is information known only to Defendants. Plaintiffs will amend this class action complaint upon discovering sufficient evidence pointing to a specific start date for Defendants' conspiracy.

138. Defendants intended to restrain trade in Aluminum and tantalum electrolytic capacitors primarily in two ways.

139. First, Defendants agreed to end price competition among themselves as to their respective Aluminum and tantalum electrolytic capacitors product portfolios by concertedly fixing, raising, maintaining or stabilizing the prices for these products, thereby removing the prices offered to purchasers from a competitive market.

140. To achieve their collective goal of artificially setting the price for their respective Aluminum and tantalum electrolytic capacitor product portfolios, each of the Defendants shared with each other, either through correspondence or during in-person meetings, confidential and competitively sensitive information pertaining to their product pricing. By way of illustration and not limitation, Defendants shared, among other things, information pertaining to the fixed and variable costs that impacted their product pricing. With knowledge of each other's competitively

sensitive information, Defendants were able to collectively determine and coordinate the pricing for the mutually interchangeable products in their respective capacitor portfolios.

141. Defendants were able to maintain the concerted pricing on their Aluminum and tantalum electrolytic capacitors through regular interaction with and communication among members of the cartel on the topic of pricing, and by publishing pricing information and cross-reference materials (*i.e.*, charts or other materials that identify which capacitors of a given Defendant are mutually interchangeable for capacitors of another Defendant) and sharing them with both the public and Defendants' largest third-party authorized distributors, most of whom distribute capacitors for a significant number of Defendants.

142. If at any time any of the Defendants priced any of its portfolio products outside the cartel's coordinated pricing, the Defendant would become aware either through notice from its fellow cartel members or from its largest third party authorized distributors. The pricing for the product at issue would then adjust back to the price determined by the cartel's members.

143. Defendants' concerted pricing has gone unnoticed to date for many reasons, including, by way of example and without limitation: (1) the sheer number and variety of Aluminum and tantalum electrolytic capacitors in Defendants' respective product portfolios makes it difficult for purchasers to track market-wide movement in pricing, especially when purchasers are primarily interested in only products with a specific capacitance, dielectric and form factor; (2) pricing for these capacitors changes frequently; and (3) noncompetitive pricing is masked at times by high volume sales of these commoditized products, in which bulk purchasers may receive volume discounts.

144. Aside from concertedly setting non-competitive prices for their Aluminum prices, Defendants also agreed to concertedly quote product lead times to purchasers. This permitted Defendants to meter out the supply of their mutually interchangeable products available on the market, thereby keeping demand high and, at times, unmet.

145. Defendants agreed to restrain their output in an effort to curb the practice of certain purchasers who would buy large lots of products from Defendants when prices appeared to be low, but would abstain when prices were higher. Defendants intended their practice of

quoting similar production lead times for their mutually interchangeable products to smooth out the inconsistent volume of purchases by these purchasers. At the same time, Defendants intended this practice to complement their efforts to artificially maintain a non-competitive price for their products.

146.    To achieve the cartel's goal of quoting uniform production lead times to purchasers, Defendants regularly interacted and communicated with other Defendants in the cartel on the topic of product lead times.

147.    Defendants regularly provided to purchasers and the public pretextual excuses for the increase of production lead times, such as problems obtaining raw materials (*e.g.*, tantalum ore) necessary for production, shipping delays, and production delays caused by natural disasters (*e.g.*, the 2011 Tohoku earthquake and tsunami, typhoons in Asia, flooding in Thailand and other countries where Defendants' capacitor manufacturing facilities are located). Because the justifications Defendants provided for long production lead times were credible, customers were lulled into believing them, despite Defendants' conspiracy. Defendants concertedly coordinated to lengthen these production lead times unjustifiably in order to foster the cartel's scheme to maintain noncompetitive prices for the Defendants' Aluminum and tantalum electrolytic capacitors.

148.    The effects of Defendants' concerted and collusive actions were significant and, in fact, were counter to what the market would expect given the comparative and continual decline in demand for Aluminum and tantalum electrolytic capacitors that began in the early 2000s. Notably, industry and government data suggests that per unit prices for Aluminum and tantalum electrolytic capacitors began to stabilize in 2005.

149.    From 2005 to present, industry data shows that per unit prices for tantalum electrolytic capacitors have increased approximately $0.008, or $8.82 per thousand.

150.    In 2005, Aluminum electrolytic capacitors began to stop their price decline from approximately $55.06 per thousand in 2003. In 2005, industry data shows that the price per unit for Aluminum electrolytic capacitors was $46.76 per thousand units, and their per unit price hovered between approximately $40.00 and $46.00 per thousand until 2013. In effect,

Defendants' conspiracy permitted manufacturers of Aluminum electrolytic capacitors (the Defendants herein) to slow the market-driven decline in price for their products, and to fix prices at supracompetitive levels.

## V. INDUSTRY CHARACTERISTICS INDICATING AND FACILITATING DEFENDANTS' CONSPIRACY TO RESTRAIN TRADE IN THE ALUMINUM AND TANTALUM ELECTROLYTIC CAPACITOR MARKET

151. For at least as long as the Class Period, the Aluminum and tantalum electrolytic capacitor industry has demonstrated numerous characteristics that have served to facilitate Defendants' conspiracy. By way of illustration and not limitation, the industry has exhibited (1) market concentration among a limited number of participants; (2) high barriers to entry for new market participants; (3) mutual interchangeability of Defendants' products; (4) inelasticity of demand; (5) commoditization; (6) weak demand in a mature market; (7) a large number of purchasers with limited purchasing power; and (8) ease of information sharing among Defendants.

### A. Market Concentration

152. Despite the ascendency of ceramic capacitors as the dominant product in the global capacitors market, the market for Aluminum and tantalum electrolytic capacitors remains quite significant. In 2004, the global volume of Aluminum and tantalum electrolytic capacitors consumed was approximately 12% of the market. Consumption for 2014 is estimated to be approximately 8% of global volume. The revenues for these sales—given the higher per unit price of both Aluminum and tantalum electrolytic capacitors relative to ceramic capacitors— approximate an estimated $6 billion for fiscal year 2014 alone. Industry data show that Aluminum and tantalum capacitors together currently account for approximately 31% of North and South American capacitor consumption (most of which are presumably consumed in North America), which is valued at approximately $680 million.

153. Market power in the Aluminum and tantalum electrolytic manufacturing industry itself is highly concentrated—a fact that is conducive to the type of collusive activity alleged herein.

154.     Though there are a relatively large number of companies that produce Aluminum electrolytic capacitors and sell them into the global and U.S. markets, significant market power is concentrated in the Defendants. In all, industry data show that the 13 largest manufacturers of Aluminum electrolytic capacitors account for approximately 92% of the market's current revenue. Specifically, industry analysts report that Defendants Nippon Chemi-Con, Nichicon, Rubycon, Panasonic, AVX and Elna currently together hold approximately 65% of the global market. Adding in the smaller market shares of Defendants Hitachi, Matsuo and Toshin Kogyo, Defendants' collective share in the Aluminum electrolytic capacitors market is approximately 70%.

155.     Given the relatively small market share (*i.e.*, mostly 3% or less) and capacity constraints of the other (non-Defendant) companies selling products in the global Aluminum electrolytic capacitors market, the Defendants' concerted actions have impacted pricing and output in the Aluminum capacitor market during the Class Period. There was not a reasonable threat that manufacturers who were not members of the cartel could undercut the cartel's concerted pricing and meet all or a significant part of market demand for mutually interchangeable Aluminum capacitors at more competitive prices.

156.     Industry data show that the seven largest manufacturers of tantalum electrolytic capacitors account for approximately 95% of the global market's current revenue. Industry analysts report that Defendants KEMET-NEC Tokin, Panasonic, AVX, Vishay SEMCO and ROHM currently together hold approximately 90% of the global market.

157.     Given the relatively small market share (*i.e.*, mostly 3% or less) and capacity constraints of the other companies selling products in the global electrolytic capacitors market, the Defendants' concerted actions have impacted pricing and output in the tantalum capacitor market during the Class Period. There was not a reasonable threat that manufacturers who were not included in the cartel could undercut the cartel's concerted pricing and meet all or a significant part of market demand for mutually interchangeable capacitors at more competitive prices.

1

### B.        High Barriers to Entry

2      158.    In a market free of price fixing, higher profits draw in other market participants

3   who wish to capture a share of profits. Where members of a cartel conspire to raise prices in a

4   market, those higher prices generate higher profits for the cartel's members. In industries

5   characterized by substantial barriers to entry, however, cartel members may be able to raise

6   prices to supracompetitive levels and reap high levels of profits.

7      159.    Companies seeking to manufacture and sell Aluminum and tantalum electrolytic

8   capacitors without having any prior involvement in the capacitors market face various significant

9   barriers to their entry.

10     160.    The electrolytic capacitors manufacturing industry is a mature one dominated by

11  established corporations, each having diverse product portfolios, multinational operations and

12  global market reach. These companies have significant experience in the global capacitors

13  industry and established reputations with both sellers of raw materials and purchasers of finished

14  capacitors. These companies typically have access to significant financial resources that not only

15  allow them to commit the capital necessary to bring online new fabrication operations and

16  facilities or to expand/retrofit existing ones to meet market demand and adjust to technological

17  changes, but also to establish and secure necessary supply chain commitments for all raw

18  materials they require. Defendants are all established manufacturers in the electrolytic capacitors

19  industry.

20     161.    For a prospective capacitor manufacturer, setting up competitive manufacturing

21  operations and supply chain operations is a significant financial and logistic hurdle to market

22  entry. A new entrant seeking to build electrolytic capacitors fabrication operations and facilities

23  faces not only the sizeable cost of building fabrication plants, but also the costs of acquiring the

24  necessary production technology, hiring and retaining skilled and knowledgeable manpower, and

25  securing the raw materials and supply chain commitments necessary to manufacture competitive

26  products. These costs would exceed hundreds of millions of dollars. Many of the Defendant

27  manufacturers have developed internal processing capabilities for raw materials and have

28

established relationships with raw materials producers that all but insure that their requirements will be met.

162.    These hurdles, however, are not the only barriers a new market entrant faces. For a new market entrant consistently to products and sell competitively and to create and sustain a diverse product portfolio, it must invest in substantial research and development operations. Additionally, the new entrant must create and maintain global sales and marketing operations so that its products can be attractive to capacitor purchasers and disrupt their existing relationships with the established electrolytic capacitor manufacturers.

163.    Ultimately, to be competitive, a new market entrant has to commit to significant financial and operational undertakings to establish itself in an industry where—in the absence of any price manipulation—profit margins are not large and economies of scale must be achieved in order to reach profitability. Moreover, because the global demand for capacitors has shifted significantly in favor of ceramics over the last decade, a new market entrant's commitment of the necessary financing and resources to establish itself in the electrolytic capacitors market would be fraught with risk.

164.    The fact that no new manufacturers have begun producing exclusively Aluminum or tantalum electrolytic capacitors in well over a decade—other than through acquisition of companies or business units already producing specific electrolytic capacitor products—strongly suggests that the electrolytic capacitors market is foreclosed to new competition.

### C.    Mutual Interchangeability of Defendants' Electrolytic Capacitors

165.    As noted earlier, capacitors of like capacitance, dielectric, and form factor are mutually interchangeable. A specific Aluminum or tantalum electrolytic capacitor manufactured by one of the Defendants therefore can be exchanged for a product of another Defendant with the same technical and operational specifications. There are no other defining physical characteristics that differentiate Defendants' various Aluminum or tantalum electrolytic capacitor products from each other.

166.    Defendants are aware of the fungibility of their specific products. Indeed, Defendants have made product cross-reference materials available through their respective web

sites, product catalogs, and/or other materials distributed to capacitor purchasers. These cross-reference materials identify a specific Defendants' capacitor product by either product number or technical and operational specifications, and it identifies specific mutually interchangeable products manufactured by competitor Defendants.  These products are easily identifiable and incorporated through electronic products sold throughout the United States purchased by Plaintiffs and the Class and subject to the unlawful artificially inflated pricing.

167.    In addition to many of Defendants' products being directly interchangeable, products with differing capacitance, dielectric and form factor—depending on circuit design and certain technical requirements—can be interchangeable for each other. There are a number of general rules recognized in the capacitors industry that govern such interchangeability, for example: (1) using a capacitor with a higher capacitance value than the circuit requires is sometimes acceptable; (2) a capacitor with a better capacitance tolerance can replace a looser tolerance component; (3) a capacitor with a higher voltage rating may be used in place of, or as a substitute for, a lower voltage rated component; (4) a physically smaller capacitor may be acceptable if lead spacing is the same and electrical specifications differences are acceptable; (5) a capacitor with a better temperature rating can replace a lower temperature rated component; (6) a capacitor with a more stable temperature coefficient can replace a component with a less stable temperature coefficient; (7) a capacitor with a lower dissipation factor can replace one with a higher dissipation factor; (8) a capacitor with a lower ESR can replace one with a higher ESR; (9) a capacitor with a higher ripple current rating can replace one with a lower ripple current rating; and (10) a capacitor with a lower leakage current rating can replace one with a higher leakage current rating.

168.    Because purchasers are aware of the mutual interchangeability of Defendants' respective capacitor products of like capacitance, dielectric and form factor, along with the possibility that certain products that are not directly fungible can still replace each other, Defendants present purchasers a broad portfolio of product choices that can meet their needs. Accordingly, but for Defendants' noncompetitive maintenance of pricing, price would be the

primary means of competition among Defendants in the Aluminum and tantalum electrolytic capacitor market.

### D. Inelastic Demand

169. Inelastic demand means that increases in price result in limited declines in quantity sold in the market. For a cartel to profit from raising prices above competitive levels, demand must be inelastic at competitive prices such that cartel members are able to raise prices without triggering a decline in sales revenue that would make the price increase unprofitable. In simple terms, demand is inelastic when the loss in volume arising from a price increase is small relative to the magnitude of the increase in price, allowing higher prices to increase revenues and profits.

170. The demand for Aluminum and tantalum electrolytic capacitors is inelastic. When there are few or no substitutes for a product, purchasers have little choice but to pay higher prices in order to produce their product. As set forth above, capacitors serve as a fundamental component in the electric circuits employed to make functional a wide variety of products within different end-markets. No other type of passive electrical component (*e.g.*, inductors, resistors) can serve as a substitute or a functional equivalent to a capacitor in an electric circuit. Accordingly, a purchaser that is either an OEM or an EMS Provider simply cannot design an electric circuit to bypass its need for a capacitor with a certain capacitance, dielectric and form factor.

171. Capacitors are also often a comparatively inexpensive cost input in electrical devices, so a purchaser facing higher prices for capacitors would generally pay that increased price rather than forgo its opportunity to sell the device that includes the capacitors.

172. Though the specific capacitors that Defendants manufacture are either mutually interchangeable for each other when a specific electric circuit is designed to incorporate them, this does not demonstrate price elasticity. Rather, this fact affirms the ubiquitous need for capacitance in electric circuits and the inability of purchasers of capacitors to forgo their use in their products or find a cost effective, functional substitute for them.

173.    Indeed, demand inelasticity for capacitors is particularly acute when a given electric circuit or an electronic device requires not just a capacitor, but one with a specific capacitance, dielectric and form factor. In that instance, a purchaser has no choice but to buy a specific capacitor with the required technical and operational characteristics.

### E.    Commoditization

174.    When a product is characterized as a commodity, market participants typically compete on the basis of price rather than other attributes such as product quality or customer service. Where competition occurs principally on the basis of price, it is easier to implement and monitor a cartel because price is more often objectively measurable and observable than non-price factors such as service.

175.    Because Aluminum and tantalum electrolytic capacitors are mass-produced products generally sold by Defendants in lots of 1,000 pieces that have relatively standardized technical and operational characteristics for the various mutually interchangeable models manufactured and sold by the Defendants, the electrolytic capacitor products at issue are largely commoditized.

176.    Defendants recognize that their Aluminum and tantalum capacitors are commoditized products. Based on the type of electrolytic capacitor they produce, Defendants face relatively similar raw materials and production costs. Accordingly, even without Defendants' sharing of confidential and competitively sensitive information as part of their price-fixing conspiracy, Defendants would have approximate knowledge of each other's costs and the bases for their respective prices. However, by having access to their co-conspirators' pricing information, Defendants can more easily implement their scheme to maintain noncompetitive prices for Aluminum and tantalum electrolytic capacitors.

### F.    Weak Demand

177.    Static or declining demand is one factor which makes the formation of a collusive arrangement more likely. Under normal business conditions, when faced with weak demand conditions, firms will attempt to increase sales by taking market share from competitors by decreasing prices. For this reason, firms faced with static or declining demand have a greater

incentive to collude to avoid price competition with competitors in order to ballast their declining business.

178.    As alleged herein, the overall demand for Aluminum and tantalum capacitors has declined significantly since the early 2000s. Demand for Aluminum and tantalum electrolytic capacitors is closely tied to the demand for consumer electronics. Over the past decade, declining sales of desktop computers and television sets have weakened demand for passive electronic components and capacitors in particular. In 2012, for example, sales of televisions and desktop computers declined roughly 10% from the previous year, whereas demand for laptop computers declined only 2%. The impact of this decline in consumer electronic demand on capacitor demand is evident in the static growth observed by the overall market and the negative growth trends reported in some segments by certain Defendants.

179.    For instance, Nichicon's 2013 Annual Report states that the company's 21.7% decrease in capacitor sales "is attributed to declining demand for digital home electronics and inverter equipment." Similarly, Taiyo Yuden's 2013 Annual Report notes that "[t]he electronics industry, to which [TaiyoYuden] belongs, has seen continued growth from the smartphone and tablet device markets. In contrast to this, the PC and television markets remain sluggish. Overall this has caused weaker demand for electronic components." AVX Corporation made the same observation in its 2013 Annual Report stating, "[o]verall sales prices for our commodity component products declined during 2013."

### G.    Large Number of Purchasers With Limited Purchasing Power

180.    In a market with many purchasers, each of whom forms a small share of the total marketplace, there is less incentive for cartel members to cheat on collusive pricing arrangements, since each potential sale is small while the risk of disrupting the collusive pricing agreement carries large penalties.

181.    In the market for Aluminum and tantalum electrolytic capacitors, Defendants each have historically sold and currently sell to a wide number of purchasers around the globe, the vast majority of whom during the Class Period make up no more than 10% of each Defendant's respective annual net sales, year over year.

182.    Defendants therefore had many reasons during the Class Period to coordinate pricing and market supply availability with each other within the auspices of their cartel.

183.    Defendants concertedly priced their respective capacitor products during the Class Period, and also provided lockstep quotation of production lead times to purchasers.

## H.    Ease of Information Sharing Among Defendants

184.    Because of their common membership in trade associations and interrelated business relationships between certain executives, officers, and employees of the Defendants, there were many opportunities both before and during the Class Period for Defendants to collude by discussing competitive information regarding their respective Aluminum and tantalum electrolytic capacitor products. The ease of communication was facilitated by the use of meetings, telephone conversations, e-mail messages, written correspondence and text messaging. Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for the various types of capacitors they produce.

185.    Industry trade associations make a market more susceptible to collusive behavior because they can provide a pretext under which conspirators can exchange sensitive company information such as pricing and market allocation.

186.    A number of industry trade associations exist in the capacitor industry. One of the largest trade associations for the industry, the Electronic Components Industry Association ("ECIA"), claims Defendants AVX, KEMET and Panasonic as members. According the ECIA, its members are granted access to "industry peers and executive networking," and events where they can be "face-toface with leaders of the authorized electronic components industry." Likewise, the European Passive Components Industry Association provides similar networking opportunities, and it includes Defendants Nichicon, AVX and Panasonic among its members.

187.    Aside from these formalized means of exchanging information among each other, Defendants have among them numerous informal links between their former and current colleagues, co-venturers, or partners employed by other Defendant companies. These links provided them the means and opportunity to exchange competitively sensitive information. Despite the billions of dollars of revenue generated by the capacitors industry worldwide, it is

still a narrow segment of the overall electronic components industry, and the key decision-makers for the major producers had personal access to each other both directly and indirectly.

188.    Further, Defendants can procure relatively detailed competitive information from industry analysts. The capacitor industry is analyzed by a limited number of market research firms that deal in detailed industry data. Each of these firms offers, for a fee, market data on pricing, supply, and other key indicators of market activity as well as market projections. The capacity and pricing information procured by these analysts is provided directly from industry participants, including certain of Defendants. Given the limited number of analysts that cover the capacitors industry, those that do are often provided highly detailed information and direct access to decision-makers for the capacitors manufacturers, including Defendants.

## VI.    CURRENT U.S. AND INTERNATIONAL ANTITRUST INVESTIGATIONS INTO ANTICOMPETITIVE PRACTICES IN THE CAPACITORS INDUSTRY

189.    Defendants' conspiracy to artificially fix, raise, maintain or stabilize prices for Aluminum and tantalum electrolytic capacitors, as well as to restrict the output of such capacitors, has only recently been discovered by law enforcement and regulatory authorities both in the United States and throughout Asia.

190.    In April 2014, the Antitrust Division of the United States Department of Justice ("DOJ") confirmed to industry sources that the government has opened an investigation into price fixing in the capacitors industry, and sources report that this investigation is being conducted out by the United States Attorney's Office for the Northern District of California.

191.    Media and industry sources have reported that this investigation has been ongoing for some time, and that the DOJ has been coordinating its efforts to investigate the capacitors industry with the People's Republic of China's National Development and Reform Commission ("NDRC"), an agency entrusted with regulating price-related anticompetitive activity by the Chinese State Council. During March 2014, the NDRC conducted several raids on Chinese operations of Japanese capacitors manufacturers.

192.    Media and industry sources indicate that a member of the cartel—believed to be Panasonic, a Defendant in this action—has approached U.S. and Chinese authorities to self-report its involvement in the conspiracy and to request prosecutorial leniency and amnesty.

193.    The U.S. Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the Department of Justice ("DOJ"). A November 19, 2008 presentation on the DOJ's website explains that "[a conditional leniency] applicant must admit its participation in a criminal antitrust violation involving price fixing…before it will receive a conditional leniency letter." One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that the applicant is not charged with a criminal offense and is not required to plead guilty to criminal charges.

194.    By applying for leniency through ACPERA, the cartel member believed to be Panasonic must have admitted to price fixing in the capacitors industry.

195.    On or about July 2, 2014, the NDRC publicly confirmed its investigation into the capacitors industry though a report by published in the China Price Supervision and Antitrust Journal and written by Xu Kunlin, Director-General of the NDRC's Price Supervision and Antimonopoly Bureau. In this report, Xu revealed that one Japanese capacitor company self-reported its cartel activity in March 2014, and that this company and other Japanese capacitor manufacturers held regular conferences to exchange market information related to their products. Media and industry sources have quoted Xu as saying that the Japanese manufacturer seeking amnesty would receive complete leniency.

196.    The United States and the PRC, however, are not the only countries investigating price fixing in the capacitors industry.

197.    Media and industry sources report that the Japan Fair Trade Commission ("JFTC") has been investigating price fixing of Aluminum and tantalum electrolytic capacitors for some time now. On or about June 24, 2014, the JFTC conducted raids of approximately eight capacitors manufacturers believed to be members of the cartel, including Panasonic, NEC Tokin, Hitachi Chemical, Nichicon and Nippon Chemi-Con. According to media reports citing sources

close to the JFTC's investigation, sales executives and other officials from the raided companies discussed and decided on price increases for capacitors for at least several years. It is reported that the JFTC suspects that the raided companies formed a cartel in order to boost profits after they had suffered financial setbacks following the global financial crisis stemming from the collapse of Lehman Brothers in 2008 and the 2011 Tohoku earthquake and tsunami in Eastern Japan.

198.    Since the beginning of 2014, investigations into the capacitors industry also have been opened by the South Korean Fair Trade Commission, the Taiwanese Fair Trade Commission, and the European Commission's competition authority.

199.    To date, few of the Defendants have commented about their being subject to these raids. Defendant Panasonic has confirmed that it was raided by both the JFTC and South Korean authorities.

200.    Defendant Taiyo Yuden has admitted to having been raided by the NDRC and has stated that it is cooperating with Chinese authorities.

201.    Defendant NEC Tokin has confirmed that it has been contacted or raided by American, Chinese and European authorities and has stated that it is cooperating with authorities.

202.    Toshin Kogyo has confirmed that it has been contacted by Japanese, Chinese and Taiwanese authorities.

203.    For some of Defendants—especially Panasonic and Sanyo—these investigations are not the first time they have been scrutinized by law enforcement and competition authorities for anticompetitive behavior. These Defendants have a documented history of cartel behavior and antitrust price-fixing recidivism.

204.    Both Panasonic and Sanyo have been investigated by the DOJ in the last several years for participating in price-fixing conspiracies involving automotive parts and lithium ion battery cells.

205.    Panasonic pled guilty for its role in a nearly six and a half year-long conspiracy to fix prices of switches, steering angle sensors, and automotive high intensity discharge ballasts installed in cars sold in the United States and elsewhere.

206. Panasonic agreed to pay a $45.8 million criminal fine, and a number of its executives pled guilty in exchange for limited fines and imprisonment.

207. Sanyo agreed to plead guilty for its role in a year and a half long conspiracy to fix prices on cylindrical lithium ion battery cells sold worldwide for use in notebook computer battery packs, and agreed to pay a $10.731 million criminal fine.

## VII. FRAUDULENT CONCEALMENT

208. Plaintiffs did not have actual nor constructive knowledge of the pertinent facts constituting their claims for relief asserted herein, despite their diligence in trying to discover such facts. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the unlawful conspiracy alleged herein until in or about March 2014, when investigations by the DOJ and competition and law enforcement authorities in the People's Republic of China, Japan, Taiwan, South Korea and the European Commission were made public.

209. Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy among capacitor manufacturers to artificially fix, raise, maintain or stabilize prices for Aluminum or tantalum electrolytic capacitors, as well as to restrict their respective output by unjustifiably extending production lead times. In fact, Defendants had secret discussions about price and output and, in furtherance of the conspiracy and falsely and deceptively attributed the causes of their unlawful conspiracy to other false reasons with the intention of concealing the true nature of their conspiracy. Defendants agreed not to discuss publicly the nature of the scheme. Defendants also gave pretextual justifications for the pricing changes and the reductions in output that occurred during the Class Period. Plaintiffs and members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMs or other direct purchasers, much less the fact that they had engaged in the secret combination, trust and conspiracy alleged herein.

210.    Indeed, Defendants relied on a variety of market-based explanations for pricing changes and reductions in output through extension of production lead times in order to conceal the conspiracy.

211.    With regard to Aluminum electrolytic capacitors, Defendants often attributed price changes and increased production lead times to difficulties procuring the necessary raw materials to manufacturer their products.

212.    For example, in 2010, Defendants Nichicon, Nippon Chemi-Con and Panasonic each made a number public statements to industry and technology media in which they attributed supply limitations and price quote adjustments to shortages of Aluminum foil and increasing costs for other raw materials required for manufacturing.

213.    These explanations are belied by industry reports and data that characterize Aluminum foil as a widely available raw material, and Aluminum electrolytic capacitors as being the product least susceptible to raw material price shocks.

214.    With regard to tantalum electrolytic capacitors, Defendants often falsely attributed price changes and increased production lead times to difficulties procuring the necessary tantalum to manufacturer their products.

215.    For example, in 2010 and 2011, Defendants Vishay and Panasonic each made a number of deceptive and misleading public statements to industry and technology media attributing supply limitations and pricing adjustments for their tantalum electrolytic capacitors to raw materials supply issues.

216.    These explanations are belied by industry and other media reports that criticize the lack of true visibility into the market for tantalum, highlight tantalum capacitor manufacturers' close ties and business arrangements with tantalum mining operations, and recognize manufacturers' efforts to process certain raw materials in-house.

217.    Additionally, these explanations are belied by certain other Defendants, such as KEMET, which noted in a 2010 "Tantalum Market Update" letter in that the tantalum capacitor industry is running at or near capacity, as witnessed by the increased lead times. *This immediate issue is not the result of raw material availability but due to the lack of investment in capacity*

*over the last 10 years—a consequence of industry pricing pressures which have driven margins to a point where we have been unable to realize reinvestment economics.* (Emphasis added.)

218. Aside from the product-specific explanations noted above, Defendants at various times during the Class Period also issued a multitude of other non-market excuses for pricing changes and reductions in output, such as labor shortages and shipping delays due to weather in Asia.

219. More specifically, from 2011 to 2013, Defendants Hitachi Chemical, Nippon Chemi- Con, Nichicon, Rubycon and Elna attributed some degree of production delays to the lasting effects of the 2011 Tohoku earthquake and tsunami in eastern Japan.

220. Further, in 2011, Defendants NEC Tokin and ROHM attributed production delays to flooding in Thailand.

221. Defendants multiple, steady misleading, deceptive, false and fraudulent statements were meant to conceal their unlawful control of the Aluminum and tantalum capacitor markets in order to manipulate supplies and pricing beyond any reasonably justifiable adjustments necessary to account for any actual pricing impact or lead time increases. Indeed, the excuses given by Defendants for their price changes and extended production lead times were always misleading (if not outright false), because they were intended to lull Plaintiffs and members of the Class into believing that the price changes and extended production lead times were the normal result of competitive and economic market forces, rather than the product of collusive, unlawful efforts. As alleged herein, Defendants and their co-conspirators made statements in the media in support of price changes that were presumed to be true and were designed to convince members of the Class to pay purportedly legitimate prices.

222. Defendants' explanations for price changes and extended lead times were pretextual, false, deceptive, materially false or misleading, and served only to cover up Defendants' conspiracy. As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the Class members have as a result of the anticompetitive and unlawful conduct alleged herein.

# VIII. EFFECTS OF DEFENDANTS' CONSPIRACY ON THE U.S. MARKET FOR ALUMINUM AND TANTALUM ELECTROLYTIC CAPACITORS AND INJURY TO PLAINTIFFS AND THE CLASS

223. Defendants' combination and conspiracy as set forth herein has had the following effects, among others:

a. Restraint on price competition among Defendants in the sale of their respective Aluminum and tantalum electrolytic capacitors during the Class Period to purchasers in the United States;

b. Prices for Aluminum and tantalum electrolytic capacitors sold by Defendants during the Class Period to purchasers in the United States have been raised, fixed, maintained, and stabilized at artificial and non-competitive levels;

c. The supply of Defendants' Aluminum and tantalum electrolytic capacitors available for sale during the Class Period to purchasers in the United States has been artificially and unjustifiably restrained; and

d. Direct purchasers from Defendants have been deprived of the benefit of free and open competition on the basis of price in the market for Aluminum and tantalum electrolytic capacitors.

224. Defendants fixed prices at artificially high levels throughout the United States and various states alleged herein affecting business, trade and commerce, substantially impacting the economies of the states, commerce and consumers.  The market for Aluminum and/or tantalum electrolytic capacitors and the sale of electronic products containing the capacitors is inextricably linked and intertwined though consumers in the United States.  Through Defendants' unlawful actions to fix, maintain, increase or stabilize prices and allocate customers for Aluminum and/or tantalum electrolytic capacitors, Defendants overcharged direct purchasers.  Defendants' overcharge or artificially inflated component part pricing was passed on from direct purchasers to end users through the intervening links within the distribution change between direct purchasers, resellers and end users throughout the United States and various states alleged herein.  As a direct and proximate result of Defendants' anticompetitive and unlawful conduct,

Plaintiffs and the Class have been injured in their business and property in that, during the Class Period, they paid more for the Aluminum and/or tantalum electrolytic capacitors they purchased directly from Defendants than they would have in the absence of Defendants' conduct.

225. Plaintiffs, and others similarly situated have suffered damage by paying an overcharge and may be compensated through indirect purchaser laws as a result of Defendants' unlawful conspiracy and unlawful and unfair trade practices. Plaintiffs and the Class have been damaged in an amount subject to proof and to be determined at trial.

## CLASS ACTION ALLEGATIONS

226. Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities that, during the period January 1, 2005 to the present, purchased electronic products, including automobiles, containing Aluminum or tantalum capacitors manufactured by the Defendants or any current subsidiary, affiliate thereof or co-conspirator.

227. Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws of the states whose laws are set forth below (the "Indirect Purchaser States"). These claims are brought by Plaintiffs on behalf of themselves and persons and entities in the Indirect Purchaser States listed below (the "Damages Class"):

> All persons and entities in the Indirect Purchaser States that, during the period January 1, 2005 to the present, purchased electronic products, including automobiles, containing Aluminum or tantalum capacitors manufactured by the Defendants or any current subsidiary, affiliate thereof or co-conspirator.

228. Alternatively, Plaintiffs bring Damages Class on behalf of all persons similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all members of the following classes (collectively, the "State Classes"), referred to together with the Damages Class as "Damages Classes.":

(a)     **Arizona:** All persons and entities, during the period January 1, 2005, to the present,

> (a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(b)     **Arkansas:** All persons and entities, during the period January 1, 2005, to the present,

> (a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(c)     **California:** All persons and entities, during the period January 1, 2005, to the present,

> (a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(d)     **District of Columbia:** All persons and entities, during the period January 1, 2005, to the present,

> (a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former

subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(e)     **Florida:** All persons and entities, during the period January 1, 2005, to the present,

(a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(f)     **Hawaii:** All persons and entities, during the period January 1, 2005, to the present,

(a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(g)     **Iowa:** All persons and entities, during the period January 1, 2005, to the present,

(a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

ANTITRUST CLASS ACTION COMPLAINT

(h)      **Kansas:** All persons and entities, during the period January 1, 2005, to the present,

>       (a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(i)      **Maine:** All persons and entities, during the period January 1, 2005, to the present,

>       (a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(j)      **Massachusetts:** All persons and entities, during the period January 1, 2005, to the present,

>       (a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(k)      **Michigan:** All persons and entities, during the period January 1, 2005, to the present,

>       (a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former

subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(l)      **Minnesota:** All persons and entities, during the period January 1, 2005, to the present,

(a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(m)      **Mississippi:** All persons and entities, during the period January 1, 2005, to the present,

(a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(n)      **Missouri:** All persons and entities, during the period January 1, 2005, to the present,

(a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

ANTITRUST CLASS ACTION COMPLAINT

(o)     **Montana:** All persons and entities, during the period January 1, 2005, to the present,

> (a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(p)     **Nebraska:** All persons and entities, during the period January 1, 2005, to the present,

> (a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(q)     **Nevada:** All persons and entities, during the period January 1, 2005, to the present,

> (a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(r)     **New Hampshire:** All persons and entities, during the period January 1, 2005, to the present,

> (a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former

subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(s) **New Mexico:** All persons and entities, during the period January 1, 2005, to the present,

(a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(t) **New York:** All persons and entities, during the period January 1, 2005, to the present,

(a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(u) **North Carolina:** All persons and entities, during the period January 1, 2005, to the present,

(a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

ANTITRUST CLASS ACTION COMPLAINT

(v)    **North Dakota:** All persons and entities, during the period January 1, 2005, to the present,

    (a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(w)    **Oregon:** All persons and entities, during the period January 1, 2005, to the present,

    (a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(x)    **South Carolina:** All persons and entities, during the period January 1, 2005, to the present,

    (a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(y)    **South Dakota:** All persons and entities, during the period January 1, 2005, to the present,

    (a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former

subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(z)     **Tennessee:** All persons and entities, during the period January 1, 2005, to the present,

(a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(aa)    **Utah:** All persons and entities, during the period January 1, 2005, to the present,

(a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(bb)    **Vermont:** All persons and entities, during the period January 1, 2005, to the present,

(a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

ANTITRUST CLASS ACTION COMPLAINT

(cc) **West Virginia:** All persons and entities, during the period January 1, 2005, to the present,

(a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(dd) **Wisconsin:** All persons and entities, during the period January 1, 2005, to the present,

(a) purchased electronic products containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Aluminum or tantalum capacitors manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

229.    The Nationwide Class and the Damages Classes are referred to herein as the "Classes." Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal government entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities.

230.    Plaintiffs do not know the exact number of the members of the Classes. Plaintiffs believe there are hundreds of thousands of members in each Class.

231.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of the Classes, thereby making appropriate relief with respect to the Classes as a whole. Questions of law or fact common to the Classes include, but are not limited to:

(a)     Whether Defendants and their co-conspirators engaged in a combination, conspiracy or trust among themselves to fix, raise, maintain or stabilize the prices of Aluminum and tantalum capacitors;

(b)     Whether Defendants and their co-conspirators agreed to allocate the supply of Aluminum and tantalum capacitors sold in the United States;

(c)     The identity of the participants in the alleged conspiracy;

(d)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(e)     Whether the conspiracy violated the Sherman Antitrust Act as alleged in Count I;

(f)     Whether the conspiracy violated state antitrust and unfair competition laws, as alleged in Count II;

(g)     Whether the conduct of the Defendants and their co-conspirators, as alleged in this Class Action Complaint, caused injury to the business or property of the Plaintiffs and the members of the Classes;

(h)     The effect of the conspiracy on the prices of Aluminum and tantalum capacitors sold in the United States during the Class Period;

(i)     Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Classes.

232.   Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.   Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Aluminum and tantalum capacitors incorporated as a discrete, separate component parts contained in electronic products and automobiles.

233.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of complex litigation, class actions, antitrust, unfair competition, unfair trade, fraud and deceptive trade practices, small business and consumer protection.

234.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

235.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other reasons, such treatment will permit a large number of similarly situated entities and persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including the provision to injured entities and persons of a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

236.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**PLAINTIFFS AND CLASSES SUFFERED ANTITRUST INJURY**

237.    During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for Aluminum and tantalum capacitors, which are discrete, separate component parts contained in electronic products and automobiles.  The market for electronic products and automobiles is inextricably linked and intertwined because the market for Aluminum and tantalum capacitors exists to be incorporated into electronic products and automobiles as end products used by consumers.

238.     Aluminum and tantalum capacitors are identifiable, discrete physical products that remain essentially unchanged when incorporated into an electronic product or vehicle.  As a result, Aluminum and tantalum capacitors follow a traceable, physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and, therefore, any costs attributable to Aluminum and tantalum capacitors can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

239.     By reason of the alleged violations of the antitrust laws and unlawful and unfair trade practices, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Aluminum and tantalum capacitors incorporated into electronic products and automobiles (within the United States, including all states having laws permitting recovery of indirect purchasers as listed herein), than they would have paid in the absence of Defendants' illegal contract, combination, trust, or conspiracy, and, as a result, Plaintiffs have suffered damages in an amount presently undetermined.  Plaintiffs' injuries are antitrust injuries of the type that that the antitrust laws were meant to punish and prevent.

240.     The alleged conspiracy inflated, fixed and stabilized the prices of Aluminum and tantalum capacitors and vehicles containing Aluminum and tantalum capacitors and restrained competition in the United States, including in all of the states having laws permitting recovery of damages by indirect purchasers, as listed herein, and therefore, had substantial effects on the commerce of the United States and substantial intrastate impact and effects on the economies of the states identified in this Class Action Complaint, which permit recovery of damages by indirect purchasers.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of State Antitrust Statutes**

**(On Behalf of Plaintiffs and the Damages Classes)**

241.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

242.     From as early as January 2005 until at least the filing of this Class Action Complaint, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Aluminum and/or tantalum electrolytic capacitors in unreasonable restraint of trade and commerce and in violation of the various state antitrust statutes set forth below

243.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive levels the price for Aluminum and/or tantalum electrolytic capacitors  and to allocate customers for Aluminum and/or tantalum electrolytic capacitors  in the United States.

244.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)     Participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Aluminum and/or tantalum electrolytic capacitors  at certain levels, and otherwise fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the classes with respect to Aluminum and/or tantalum electrolytic capacitors  sold in the United States;

a.   Allocating customers and markets for Aluminum and/or tantalum electrolytic capacitors  in the United States in furtherance of their agreements; and

b.   Participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

245.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and the allocate customers with respect to Aluminum and/or tantalum electrolytic capacitors.  As a result of Defendants unlawful actions to fix, maintain, increase or stabilize prices and allocate customers for Aluminum and/or tantalum electrolytic capacitors, Defendants

overcharged direct purchasers and this overcharge or artificially inflated component part pricing was passed on to end users through the intervening links within the distribution change between direct purchasers, resellers and end users.

246.  Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following state antitrust statutes.

247.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

248.  Defendants' combinations or conspiracies had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

249.  During the Class Period, Defendants' illegal conduct was intrastate, substantially affected Arizona commerce, and was directed through the economy of the State of Arizona, directly affecting trade, commerce and consumers residing in the State of Arizona.

250.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

251.  By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*  Accordingly, Plaintiffs and members of the classes seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

252.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)  During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720 of the California Business and

Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Aluminum and/or tantalum electrolytic capacitors at supracompetitive levels.

(b)      The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Aluminum and/or tantalum electrolytic capacitors.

(c)      For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices, and course of conduct set forth above and the following:  (1) Fixing, raising, stabilizing, and pegging the price of Aluminum and/or tantalum electrolytic capacitors; and (2) Allocating among themselves the production of Aluminum and/or tantalum electrolytic capacitors.

(d)      The combination and conspiracy alleged herein has had, *inter alia*, the following effects upon the commerce of California: (1) Price competition in the sale of Aluminum and/or tantalum electrolytic capacitors  has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Aluminum and/or tantalum electrolytic capacitors  sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased products containing Aluminum and/or tantalum electrolytic capacitors  from entities who purchased the chemical from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and

property in that they paid more for products containing Aluminum and/or tantalum electrolytic capacitors than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the classes seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

253. Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the classes, who resided in the District of Columbia and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors  in the District of Columbia, were deprived of free and open competition, in the District of Columbia; and (4) Plaintiffs and members of the classes, who resided in the District of Columbia and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors  in the District of Columbia, paid supracompetitive, artificially inflated prices in the District of Columbia for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)      During the Class Period, Defendants' illegal conduct was intrastate, substantially affected District of Columbia commerce, and was directed through the economy of the District of Columbia, directly affecting trade, commerce and consumers residing in the District of Columbia.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the classes seek all forms of relief available under District of Columbia Code Ann. §§ 28-45601, *et seq.*

254.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.* The allegations contained herein involving the State of Hawaii are limited to unfair trade within Hawaii, thus, any applicable notice to government entities is not required by statute due to the narrowing of the allegations in this pleading.

(a)     Defendants unlawful conduct had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (d) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes pain supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected Hawaii commerce and was directed throughout the economy of the State of Hawaii directly affecting trade, commerce and consumers residing within the State of Hawaii.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered in to agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*  Accordingly, Plaintiffs and members of the classes seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*

255.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)      During the Class Period, Defendants' illegal conduct was intrastate, substantially affected Iowa commerce and was directed throughout the economy of the State of Iowa directly affecting trade, commerce and consumers residing within the State of Iowa.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*   Accordingly, Plaintiffs and members of the classes seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

256.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

(a)　　Defendants' combinations or conspiracies had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Aluminum and/or tantalum electrolytic capacitors prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)　　During the Class Period, Defendants' illegal conduct was intrastate, substantially affected Kansas commerce and was directed throughout the economy of the State of Kansas directly affecting trade, commerce and consumers residing within the State of Kansas.

(c)　　As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)　　By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiffs and members of the classes seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

257.　　Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(a)　　Defendants' combinations or conspiracies had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors price competition was restrained, suppressed, and eliminated throughout Maine; (2) Aluminum and/or tantalum electrolytic capacitors prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and

members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected Maine commerce and was directed through the economy of the State of Maine directly affecting trade, commerce and consumers residing within the State of Maine.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiffs and members of the classes seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

258.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected Michigan commerce, and was directed through the economy of the State of Michigan, directly affecting trade, commerce and consumers residing in the State of Michigan.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiffs and members of the classes seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

259.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected Minnesota commerce, and was directed through the economy of the State of Minnesota, directly affecting trade, commerce and consumers residing in the State of Minnesota.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.*  Accordingly, Plaintiffs and members of the classes seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

260.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the classes who resided in Mississippi and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors  in Mississippi were deprived of free and open competition in Mississippi; and (4) Plaintiffs and members of the classes who resided in Mississippi and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors  in Mississippi paid supracompetitive, artificially inflated prices in Mississippi for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)    During the Class Period, Defendants' illegal conduct was intrastate, substantially affected Mississippi commerce, and was directed through the economy of the State of Mississippi, directly affecting trade, commerce and consumers residing in the State of Mississippi.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the classes seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

261.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Aluminum and/or tantalum electrolytic capacitors   price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Aluminum and/or tantalum electrolytic capacitors   prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected Nebraska commerce, and was directed through the economy of Nebraska, directly affecting trade, commerce and consumers residing in the State of Nebraska.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiffs and members of the classes seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

262.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Aluminum and/or tantalum electrolytic capacitors   price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Aluminum and/or tantalum electrolytic capacitors   prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the classes who resided in Nevada and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors   in Nevada were deprived of

79

free and open competition in Nevada; and (4) Plaintiffs and members of the classes who resided in Nevada and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors  in Nevada paid supracompetitive, artificially inflated prices in Nevada for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected Nevada commerce, and was directed through the economy of the State of Nevada, directly affecting trade, commerce and consumers residing in the State of Nevada.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.* Accordingly, Plaintiffs and members of the classes seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

263.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected New Hampshire commerce, and was directed through the

economy of the State of New Hampshire, directly affecting trade, commerce and consumers residing in the State of New Hampshire.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Accordingly, Plaintiffs and members of the classes seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

264.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected New Mexico commerce, and was directed through the economy of the State of New Mexico, directly affecting New Mexico trade, commerce and consumers residing in the State of New Mexico.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

Accordingly, Plaintiffs and members of the classes seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

265. Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout New York; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the classes who resided in New York and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors  in New York were deprived of free and open competition in New York; and (4) Plaintiffs and members of the classes who resided in New York paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors  when they purchased, in New York, products containing Aluminum and/or tantalum electrolytic capacitors  or purchased, in New York, products containing Aluminum and/or tantalum electrolytic capacitors  that were otherwise of lower quality than would have been absent the conspirators' illegal acts, or were unable to purchase products containing Aluminum and/or tantalum electrolytic capacitors  that they would have otherwise purchased absent the illegal conduct.

(b)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected New York commerce, and was directed through the economy of the State of New York, directly affecting trade, commerce and consumers in the State of New York.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.*  The conduct set forth above is a per se violation of the Act.  Accordingly, Plaintiffs and members of the classes seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

266.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the classes who resided in North Carolina and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors  were deprived of free and open competition in North Carolina; and (4) Plaintiffs and members of the classes who resided in North Carolina and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors  in North Carolina paid supracompetitive, artificially inflated prices in North Carolina for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected North Carolina commerce and was directed through the economy of North Carolina, directly affecting trade, commerce and consumers residing in the State of North Carolina.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(c)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

Accordingly, Plaintiffs and members of the classes seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq.*

267. Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

(a) Defendants' combinations or conspiracies had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(b) During the Class Period, Defendants' illegal conduct was intrastate, substantially affected North Dakota commerce, and was directed through the economy of the State of North Dakota, directly affecting trade, commerce and consumers residing in the State of North Dakota.

(c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the classes seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

268. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*  Plaintiffs will provide notice to Defendants and seek leave to amend pursuant to Oregon law.   However, Defendants, upon information and belief, do not contain businesses or assets in the State of Oregon.  Making pre-suit demand upon the Defendants for settlement would be futile and unnecessarily delay the

84

relief sought by Plaintiffs in this lawsuit under Oregon law. Moreover, the pre-suit demand conflicts with Federal Rules of Civil Procedure for commencing a lawsuit in federal court and the separation of powers doctrine.

(a)  Defendants' combinations or conspiracies had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)  During the Class Period, Defendants' illegal conduct was intrastate, substantially affected Oregon commerce, and was directed at the economy of the State of Oregon, directly affecting trade, commerce and consumers residing in the State of Oregon.

(c)  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiffs and members of the classes seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

269.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1., *et seq.*

(a)  Defendants' combinations or conspiracies had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and

stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the classes who resided in South Dakota and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors  in South Dakota were deprived of free and open competition in South Dakota; and (4) Plaintiffs and members of the classes who resided in South Dakota and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors  in South Dakota paid supracompetitive, artificially inflated prices in South Dakota for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected South Dakota commerce, and was directed through the economy of the State of South Dakota, directly affecting trade, commerce and consumers residing in the State of South Dakota.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.*  Accordingly, Plaintiffs and members of the classes seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

270.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the classes who resided in Tennessee and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors  in Tennessee were

deprived of free and open competition in Tennessee; and (4) Plaintiffs and members of the classes who resided in Tennessee and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors  in Tennessee paid supracompetitive, artificially inflated prices in Tennessee for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected Tennessee commerce, and was directed through the economy of the State of Tennessee, directly affecting trade, commerce and consumers residing in the State of Tennessee.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.  The effect of the conspiracy in Tennessee was primarily felt intrastate, throughout the entire State of Tennessee and impacted the entire economy of Tennessee.

(c)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly, Plaintiffs and members of the classes seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

271.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout Utah; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(b) During the Class Period, Defendants' illegal conduct was intrastate, substantially affected Utah commerce, and was directed through the economy of the State of Utah, directly affecting trade, commerce and consumers residing in the State of Utah.

(c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.* Accordingly, Plaintiffs and members of the classes seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

272. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2451, *et seq.*

(a) Defendants' combinations or conspiracies had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Aluminum and/or tantalum electrolytic capacitors prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(b) During the Class Period, Defendants' illegal conduct was intrastate, substantially affected Vermont commerce, and was directed through the economy of the State of Vermont, directly affecting trade, commerce and consumers residing in the State of Vermont.

(c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2451, *et seq.*  Plaintiffs are entitled to relief pursuant to Vermont Stat. Ann. 9 § 2465 and any other applicable authority.   Accordingly, Plaintiffs and members of the classes seek relief available under Vermont Stat. Ann. 9 §§ 2451, *et seq.*

273.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors   price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the classes who resided in West Virginia and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors  in West Virginia were deprived of free and open competition in West Virginia; and (4) Plaintiffs and members of the classes who resided in West Virginia and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors  in West Virginia paid supracompetitive, artificially inflated prices in West Virginia for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected West Virginia commerce, and was directed through the economy of the State of West Virginia, directly affecting trade, commerce and consumers residing in the State of West Virginia.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq.*

Accordingly, Plaintiffs and members of the classes seek all available under West Virginia Code §§ 47-18-1, *et seq.*

274. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors   price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected Wisconsin commerce, and was directed through the economy of the State of Wisconsin, directly affecting trade, commerce and consumers residing in the State of Wisconsin.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*  Accordingly, Plaintiffs and members of the classes seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

275. Plaintiffs and members of the classes in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement.  Plaintiffs and members of the classes have paid more for products containing Aluminum and/or tantalum electrolytic capacitors than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws

of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

276. In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and members of the classes.

277. Accordingly, Plaintiffs and the members of the classes in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**SECOND CLAIM FOR RELIEF**

**Violation of State Consumer Protection Statutes**

**(On Behalf of Plaintiffs and the Damages Classes)**

278. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Class Action Complaint.

279. Defendants knowingly engaged in unlawful, unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

280. Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101.

(a) Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which products containing Aluminum and/or tantalum electrolytic capacitors were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the classes.

(b) The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated § 4-88-107(a)(10).

(c)     Defendants' unlawful conduct had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(d)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected Arkansas commerce, and was directed through the economy of the State of Arkansas, directly affecting trade, commerce and consumers residing in the State of Arkansas.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the classes have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the classes seek all relief available under that statute.

281.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)     During the Class Period, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)     During the Class Period, Defendants illegal conduct was intrastate, substantially affected California commerce, and was directed through the

economy of the State of California, directly affecting trade, commerce and consumers residing in the State of California.

(c)       This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged in this Class Action Complaint, which violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(d)       The Defendants' conduct as alleged in this Class Action Complaint violated Section 17200.  The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the violations of Section 16720, *et seq.*, of the California Business and Professions Code, as set forth above;

(e)       Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent;

(f)       Defendants' acts or practices are unfair to purchasers of products containing Aluminum and/or tantalum electrolytic capacitors  in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(g)       Defendants' unlawful conduct had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors   price competition was restrained, suppressed, and eliminated throughout California; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at

artificially high levels throughout California; (3) Plaintiffs and members of the classes who resided in California and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors in California were deprived of free and open competition in California; and (4) Plaintiffs and members of the classes who resided in California and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors in California paid supracompetitive, artificially inflated prices in California for products containing Aluminum and/or tantalum electrolytic capacitors.

(h)     Defendants' acts and practices are unlawful, fraudulent, or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(i)     Plaintiffs and members of the classes are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

(j)     The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

(k)     The unlawful, fraudulent, deceptive, and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the classes to pay supracompetitive and artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors. Plaintiffs and the members of the classes suffered injury in fact and lost money or property as a result of such unfair competition.

(l)     The conduct of Defendants as alleged in this Class Action Complaint violates Section 17200 of the California Business and Professions Code.

(m)     As alleged in this Class Action Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the classes are

accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

282. Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

(a) Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Aluminum and/or tantalum electrolytic capacitors was sold, distributed, or obtained in the District of Columbia.

(b) The foregoing conduct constituted "unlawful trade practices" within the meaning of D.C. Code § 28-3904.

(c) During the Class Period, Defendants' illegal conduct was intrastate, substantially affected District of Columbia commerce, and was directed through the economy of the District of Columbia, directly affecting trade, commerce and consumers residing in the District of Columbia.

(d) Defendants' unlawful conduct had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Aluminum and/or tantalum electrolytic capacitors prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(e) As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the classes have been injured in their business and property and are

threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the classes seek all relief available under that statute.

283. Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

(a) Defendants' unlawful conduct had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors price competition was restrained, suppressed, and eliminated throughout Florida; (2) Aluminum and/or tantalum electrolytic capacitors prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(b) During the Class Period, Defendants' illegal conduct was intrastate, substantially affected Florida commerce, and was directed through the economy of the State of Florida, directly affecting trade, commerce and consumers residing in the State of Florida.

(c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d) Defendants have engaged in unfair competition or unlawful, unfair, or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the classes seek all relief available under that statute.

284. Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch.

93A, § 1, *et seq.*  Plaintiffs will provide notice to Defendants and seek leave to amend pursuant to Massachusetts law.  However, Defendants, upon information and belief, do not contain businesses or assets in the State of Massachusetts.  Making pre-suit demand upon the Defendants for settlement would be futile and unnecessarily delay the relief sought by Plaintiffs in this lawsuit under Massachusetts law.  Moreover, the pre-suit demand conflicts with Federal Rules of Civil Procedure for commencing a lawsuit in federal court and the separation of powers doctrine.

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Aluminum and/or tantalum electrolytic capacitors  was sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the classes.

(b)      The aforementioned conduct on the part of the Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch. 93A, §§ 2, 11.

(c)      Defendants' unlawful conduct had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(d)      During the Class Period, Defendants' illegal conduct was intrastate, substantially affected Massachusetts commerce, and was directed through the economy of the State of Massachusetts, directly affecting trade, commerce and consumers in the State of Massachusetts.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the classes have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch. 93A, §§ 2,11, and, accordingly, Plaintiffs and the members of the classes seek all relief available under those statutes.

285.   Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*

(a)     Defendants engaged in the conduct described in this Class Action Complaint in connection with the sale of products containing Aluminum and/or tantalum electrolytic capacitors in a market that includes Missouri.

(b)     During the Class Period, Defendants'' illegal conduct was intrastate, substantially affected Missouri commerce, and was directed through the economy of the State of Missouri, directly affecting trade, commerce and consumers residing in the State of Missouri.

(c)     Defendants agreed to, and in fact did, fix, control, and/or maintain at artificial and non-competitive levels, the price at which Aluminum and/or tantalum electrolytic capacitors was sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive, and unscrupulous, and caused substantial injury to Plaintiffs and members of the classes.

(d)     Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the classes concerning Defendants' unlawful activities and artificially inflated prices for Aluminum and/or tantalum electrolytic capacitors.   The concealed, suppressed, and omitted facts would have been

important to Plaintiffs and members of the classes as they related to the cost of products containing Aluminum and/or tantalum electrolytic capacitors.

(e)     Defendants' unlawful conduct had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(f)     The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

(g)     As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the classes suffered ascertainable loss of money or property.

(h)     Accordingly, Plaintiffs and members of the classes seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce," as further interpreted by the Missouri Code of State Regulations, which provides for the relief sought in this Count.

286.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*, and Mont. Code, §§ 30-14-201, *et seq.*

(a)     Defendants unlawful conduct had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout Montana; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the classes who resided in Montana and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors  in Montana were deprived of free and open competition in Montana; and (4) Plaintiffs and members of the classes who resided in Montana and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors  in Montana paid supracompetitive, artificially inflated prices in Montana for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected Montana commerce, and was directed through the economy of the State of Montana, directly affecting trade, commerce and consumers residing in the State of Montana.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq.*, and Mont. Code. §§ 30-14-201, *et seq.*, and accordingly, Plaintiffs and members of the classes seek all relief available under those statutes.

287.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at a non-competitive and artificially inflated levels, the price at which Aluminum and/or tantalum

electrolytic capacitors was sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the classes.

(b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices" in violation of N.M.S.A. § 57-12-3, in that such conduct, *inter alia*, and as set forth in N.M.S.A. § 57-12-2E, resulted in a gross disparity between the value received by Plaintiffs and the members of the classes and the prices paid by them for products containing Aluminum and/or tantalum electrolytic capacitors.

(c)     Defendants' unlawful conduct had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(d)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected New Mexico commerce, and was directed through the economy of the State of New Mexico, directly affecting trade, commerce and consumers residing in the State of New Mexico.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the classes have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the classes seek all relief available under that statute.

288.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the price at which Aluminum and/or tantalum electrolytic capacitors  was sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and the members of the classes.

(b)    Defendants deceptively led purchasers, such as Plaintiffs and members of the classes, to believe that the products containing Aluminum and/or tantalum electrolytic capacitors they had purchased had been sold at a legal, competitive price, when they had in fact been sold at a collusively obtained and inflated price, that passed on to them the artificially inflated price of Aluminum and/or tantalum electrolytic capacitors.

(c)    The conduct of the Defendants described in this Class Action Complaint constituted consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)    Defendants' unlawful conduct had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout New York; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the classes who reside in and/or made purchases of products containing Aluminum and/or tantalum electrolytic capacitors  in New York were deprived of free and open competition and subject to Defendants' deceptive practices in New York; and (4) Plaintiffs and members of the classes who reside in and/or made

purchases of products containing Aluminum and/or tantalum electrolytic capacitors in New York paid supracompetitive, artificially inflated prices in New York for products containing Aluminum and/or tantalum electrolytic capacitors, and were subjected to Defendants' deceptive practice in New York.

(e)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected New York commerce, and was directed through the economy of the State of New York, directly affecting trade, commerce and consumers residing in the State of New York.

(f)     During the Class Period, each of the Defendants named in this Class Action Complaint directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold, and/or distributed Aluminum and/or tantalum electrolytic capacitors in New York.

(g)     Plaintiffs and members of the classes seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

289.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*

(a)     Defendants agreed to, and did in fat, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the price at which Aluminum and/or tantalum electrolytic capacitors was sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the classes.

(b)     The conduct of the Defendants described in this Class Action Complaint constituted consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

(c)     Defendants' unlawful conduct had the following effects upon purchasers in North Carolina or products containing Aluminum and/or tantalum electrolytic capacitors: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the classes who reside in North Carolina and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors  in North Carolina were deprived of free and open competition in North Carolina; and (4) Plaintiffs and members of the classes who resided in North Carolina and/or purchased products containing Aluminum and/or tantalum electrolytic capacitors  in North Carolina paid supracompetitive, artificially inflated prices in North Carolina for products containing Aluminum and/or tantalum electrolytic capacitors.

(d)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected North Carolina commerce, and was directed through the economy of the State of North Carolina, directly affecting trade, commerce and consumers residing in the State of North Carolina.

(e)     During the Class Period, each of the Defendants named in this Class Action Complaint, directly, or indirectly and through affiliated they dominated and controlled, manufactured, sold, and/or distributed Aluminum and/or tantalum electrolytic capacitors in North Carolina.

(f)     Plaintiffs and members of the classes seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the classes seek all relief available under that statute.

290. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

(a) Plaintiffs and members of the Damages Classes purchased Aluminum and/or tantalum electrolytic capacitors for personal, family, or household purposes.

(b) Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce in a market that was intrastate and includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Aluminum and/or tantalum electrolytic capacitors was sold, distributed, or obtained in Rhode Island. Defendants' illegal conduct was intrastate, substantially affected Rhode Island commerce, and was directed through the economy of the State of Rhode Island, directly affecting trade, commerce and consumers residing in the State of Rhode Island.

(c) Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Classes concerning their unlawful activities and artificially inflated prices for Aluminum and/or tantalum electrolytic capacitors. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, they breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that their Aluminum and/or tantalum electrolytic capacitor prices were competitive and fair.

(d) Defendants' unlawful conduct had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Aluminum and/or tantalum electrolytic capacitors prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Classes were deprived of free and open competition;

and (4) Plaintiffs and members of the Damages Classes paid supracompetitive, artificially inflated prices for Aluminum and/or tantalum electrolytic capacitors.

(e)     As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Classes suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(f)     Defendants' deception, including their omissions concerning the price of Aluminum and/or tantalum electrolytic capacitors, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Aluminum and/or tantalum electrolytic capacitors at prices born by a free and fair market. Defendants' omissions constitute information important to Plaintiffs and members of the Damages Classes as they related to the cost of the Aluminum and/or tantalum electrolytic capacitors they purchased.

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Classes seek all relief available under that statute.

291.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors  price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Aluminum and/or tantalum electrolytic capacitors  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4)

Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Aluminum and/or tantalum electrolytic capacitors.

(b)     During the Class Period, Defendants' illegal conduct was intrastate, substantially affected South Carolina commerce, and was directed through the economy of the State of South Carolina, directly affecting trade, commerce and consumers residing in the State of South Carolina.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 29-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the classes seek all relief available under that statute.

292.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Aluminum and/or tantalum electrolytic capacitors  was sold, distributed, or obtained in Vermont.  Defendants' conduct was intrastate, substantially affected Vermont commerce, and was directed through the economy of the State of Vermont, directly affecting trade, commerce and consumers residing in Vermont.

(b)     Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Classes concerning Defendants' unlawful activities and artificially inflated prices for Aluminum and/or tantalum electrolytic capacitors. Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence.  Defendants misrepresented to all purchasers during the Class

ANTITRUST CLASS ACTION COMPLAINT

Period that Defendants' Aluminum and/or tantalum electrolytic capacitor prices were competitive and fair.

(c)     Defendants' unlawful conduct had the following effects: (1) Aluminum and/or tantalum electrolytic capacitors   price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Aluminum and/or tantalum electrolytic capacitors   prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Classes were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Classes paid supra-competitive, artificially inflated prices for Aluminum and/or tantalum electrolytic capacitors.

(d)     As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Classes suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(e)     Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Aluminum and/or tantalum electrolytic capacitors, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Aluminum and/or tantalum electrolytic capacitors   at prices set by a free and fair market.   Defendants' misleading conduct and unconscionable activities constitute unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Classes seek all relief available under that statute.

### THIRD CLAIM FOR RELIEF

### Unjust Enrichment

### (On Behalf of Plaintiffs and the Damages Classes)

293.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

294.    Plaintiffs bring this claim for unjust enrichment, in the alternative, under the laws of all states listed in the First and Second Claims hereinabove, including Arizona, Arkansas, California, Florida, Kansas, Hawaii, Iowa, Maine, Massachusetts, Montana, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Washington, D.C., West Virginia and Wisconsin. Defendants have been unjustly enriched by receiving inflated prices and unlawful prices as a result of a conspiracy to violate laws in the United States.  This unlawful conspiracy affected commerce and manipulated prices of Aluminum and tantalum electrolytic capacitors.

295.    This unlawful conspiracy affected and impacted the Plaintiffs who are persons or entities that paid an overpayment as the result of Defendants' unlawful and inequitable behavior in the United States, including the unjust enrichment laws of the States of Arizona, Arkansas, California, Florida, Kansas, Hawaii, Iowa, Maine, Massachusetts, Montana, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Washington, D.C., West Virginia and Wisconsin.

296.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, as a minimum, unlawfully inflated prices and unlawful profits on Aluminum and/or tantalum electrolytic capacitors.

297.    Defendants have benefitted from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Plaintiffs or the members of the classes for products containing Aluminum and/or tantalum electrolytic capacitors.

298.    Plaintiffs and the members of the classes are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the classes are entitled to the establishment of a constructive trust

consisting of all ill-gotten gains from which Plaintiffs and the members of the classes may make claims on a pro rata basis.

299.   Providing pre-lawsuit notice to the Defendants and the pursuit of any remedies against the entities from which Plaintiffs and members of the classes purchased products containing Aluminum and/or tantalum electrolytic capacitors subject to Defendants' conspiracy would have been futile and would not have provided a true avenue for recovery or restitution of the unlawfully obtained ill-gotten gains or artificially inflated prices, given that those entities did not take part in Defendants' conspiracy.  Thus unjust enrichment may be brought in this Court and failure to exhaust or provide a pre-lawsuit notice under any of the States pled herein, which may require such notice, or exhaustion, is not a bar to recovery under this alternative theory of recovery for artificially inflating prices to the detriment of indirect purchasers.

## FOURTH CLAIM FOR RELIEF

### Injunctive and Equitable Relief

### (On Behalf of Plaintiffs and the Nationwide Class)

300.   Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

301.   The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

302.   At least as early as January 2002, and continuing until at least the filing of this Complaint, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Aluminum and/or tantalum electrolytic capacitors , thereby creating anticompetitive effects.

303.   The anticompetitive acts were intentionally directed at the United States market for Aluminum and/or tantalum electrolytic capacitors and had a substantial and foreseeable effect

on interstate commerce by raising and fixing prices for Aluminum and/or tantalum electrolytic capacitors throughout the United States.

304.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Aluminum and/or tantalum electrolytic capacitors.

305.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Aluminum and/or tantalum electrolytic capacitors  have been harmed by being forced to pay inflated, supracompetitive prices for Aluminum and/or tantalum electrolytic capacitors.

306.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

307.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for Aluminum and/or tantalum electrolytic capacitors  has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for Aluminum and/or tantalum electrolytic capacitors  sold by Defendants and their coconspirators have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels throughout the United States;

(c)    Prices for products purchased by Plaintiffs and the members of the Nationwide Class containing Aluminum and/or tantalum electrolytic capacitors manufactured by Defendants and their coconspirators were inflated; and

(d)    Plaintiffs and members of the Nationwide Class who purchased products containing Aluminum and/or tantalum electrolytic capacitors indirectly from Defendants have been deprived of the benefits of free and open competition.

308.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Aluminum and/or

tantalum electrolytic capacitors than they would have paid and will pay in the absence of the conspiracy.

309.     Plaintiffs and members of the Nationwide Class will continue to be subject to Defendants' price-fixing, bid-rigging, and market allocations, which will deprive Plaintiffs and members of the Nationwide Class of the benefits of free competition, including competitively-priced Aluminum and/or tantalum electrolytic capacitors.

310.     Plaintiffs and members of the Nationwide Class will continue to lose funds due to overpayment for Aluminum and/or tantalum electrolytic capacitors.

311.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

312.     There being no injunction in force preventing repetition of Defendants' conspiratorial conduct, Plaintiffs will face possible future antitrust injury unless this Court enjoins the conduct and all improper information exchanges that facilitated it.  Thus, Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants preventing them from repeating the violations alleged herein.

## PRAYER AND DEMAND FOR JUDGMENT

**WHEREFORE,** Plaintiffs respectfully request that the Court enter judgment on its behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

A.     This action may proceed as a class action, with Plaintiffs serving as the Class Representatives, and with Plaintiffs' counsel appointed as Class Counsel;

B.     Defendants have combined and conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations and are entitled to nationwide injunctive relief;

C.     Plaintiffs and the Class are entitled to recover actual and compensatory damages sustained by them, as provided by the various state antitrust, unfair trade practice anti-competition and consumer protection laws alleged herein, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount subject to proof at trial, which is to be trebled in accordance with state law, where applicable;

ANTITRUST CLASS ACTION COMPLAINT

D.      Plaintiffs and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

E.      Plaintiffs and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

a.      A judicial determination declaring the rights of Plaintiffs and the Class, and the corresponding responsibilities of Defendants; and

b.      Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from continuing and maintaining the conspiracy or agreements alleged herein;

F.      Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class;

G.      Plaintiffs and the Class recover their costs and expenses of this suit, including reasonable attorneys' fees as provided by law; and

H.      Plaintiffs and the Class receive such other or further relief as may be just and proper.

Dated: August 20, 2014                                    Respectfully submitted,

**ROBINSON CALCAGNIE ROBINSON
SHAPIRO DAVIS, INC.**
19 Corporate Plaza Drive
Newport Beach, California 92660
(949) 720-1288 (Telephone)
(949) 720-1292 (Facsimile)

/s/ Daniel S. Robinson
By:     Daniel S. Robinson
        *Consumer Indirect Purchaser Plaintiffs*

ANTITRUST CLASS ACTION COMPLAINT

Phillip Duncan (*Pro Hac Vice* Forthcoming)
Richard Quintus
Justin Zachary
**DUNCAN FIRM, P.A.**
900 South Shackleford, Suite 725
Little Rock, Arkansas 72211
(701) 228-7600 (Telephone)
(701) 228-0415 (Facsimile)
E-mail: phillip@duncanfirm.com
*Consumer Indirect Purchaser Plaintiffs*

Kent W. Emison (*Pro Hac Vice* Forthcoming)
**LANGDON & EMISON**
1828 Swift, Suite 303
N Kansas City, Missouri 64116
(660) 259-6175 (Telephone)
(660) 259-4571 (Facsimile)
E-mail: kent@lelaw.com
*Consumer Indirect Purchaser Plaintiffs*

Richard Lombardo (*Pro Hac Vice* Forthcoming)
**SHAFFER LOMBARDO SHURIN**
911 Main Street, Suite 2000
Kansas City, Missouri 64105
(816) 931-0500 (Telephone)
(816) 931-5775 (Facsimile)
E-mail: RLombardo@sls-law.com
*Consumer Indirect Purchaser Plaintiffs*

William W. Heaton (*Pro Hac Vice* Forthcoming)
**HEATON & MOORE, P.C.**
44 North Second Street, Suite 1200
Memphis, Tennessee 38103
(901) 526-5975 (Telephone)
(901) 527-3633 (Facsimile)
wheaton@heatonandmoore.com
*Indirect Purchaser Business Plaintiffs*

**Attorneys for INDIRECT PURCHASER PLAINTIFFS**

EVERETT ELLIS, FREDRICK P. HEGE, JR.
MIKE FISHER, MICHAEL W. DAVIS,
JANE SCHMIT, JOHNNY WALKER,
JOHN E. MCDOWELL, MARTA MICHAUD
TIMOTHY DUFFY, SEAN G. TARJOTO,

TODD STOWATER, DAVID C. KELLER,
JAMIE THAEMERT; SCOT DUNLAP;
SCOTT HUFFMAN; CHARLES RUSHER;
JENNIFER RUSHER; DAVID STANDRIDGE;
TROY GIBSON; GARTH RUSSELL, M.D.;
BHRAC, LLC, d/b/a BEVERLY HILLS RENT-A-CAR,
BEVERLY HILLS LEASING LLC
CETACEA SOUND, INC.,
COMPUTING SOLUTIONS, INC., d/b/a
WIRED! BY COMPUTING SOLUTIONS, d/b/a
WIRED! TECHNOLOGY PARTNERS
GOSSETT MOTOR CARS, INC., d/b/a
GOSSETT KIA; GOSSETT MOTOR CARS,
INC., d/b/a GOSSETT MAZDA;
GOSSETT MOTOR CARS, INC., d/b/a
GOSSETT HYUNDAI; GOSSETT MOTOR
CARS, INC., d/b/a GOSSETT MITSUBISHI;
GOSSETT MOTOR CARS, INC., d/b/a
GOSSETT AUDI; GOSSETT MOTOR CARS,
INC., d/b/a GOSSETT VOLKSWAGEN;
GOSSETT MOTOR CARS, INC., d/b/a
GOSSETT PORSCHE; GOSSETT MOTOR
CARS, INC. d/b/a/ GOSSETT CHRYSLER/
JEEP/DODGE; GOSSETT MOTOR CARS,
INC., d/b/a GOSSETT FIAT OF MEMPHIS;
WE 3 GOSSETT, LLC, d/b/a GOSSETT
VOLKSWAGEN GERMANTOWN;
WE 3 GOSSETT, LLC, d/b/a GOSSETT KIA SOUTH;
WE 3 GOSSETT, LLC, d/b/a GOSSETT HYUNDAI
SOUTH; WE 3 GOSSETT, LLC, d/b/a GOSSETT FIAT;
AUTORAMA, INC., d/b/a MERCEDES BENZ OF
MEMPHIS, on behalf of themselves and all others similarly situated,

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury of all the claims asserted in this complaint so triable.

Dated: August 20, 2014                    Respectfully submitted,

**ROBINSON CALCAGNIE ROBINSON SHAPIRO DAVIS, INC.**
19 Corporate Plaza Drive
Newport Beach, California 92660
(949) 720-1288 (Telephone)
(949) 720-1292 (Facsimile)

/s/ Daniel S. Robinson

By:    Daniel S. Robinson
       *Consumer Indirect Purchaser Plaintiffs*

Phillip Duncan (*Pro Hac Vice* Forthcoming)
Richard Quintus
Justin Zachary
**DUNCAN FIRM, P.A.**
900 South Shackleford, Suite 725
Little Rock, Arkansas 72211
(701) 228-7600 (Telephone)
(701) 228-0415 (Facsimile)
E-mail: phillip@duncanfirm.com
*Consumer Indirect Purchaser Plaintiffs*

Kent W. Emison (*Pro Hac Vice* Forthcoming)
**LANGDON & EMISON**
1828 Swift, Suite 303
N Kansas City, Missouri 64116
(660) 259-6175 (Telephone)
(660) 259-4571 (Facsimile)
E-mail: kent@lelaw.com
*Consumer Indirect Purchaser Plaintiffs*

Richard Lombardo (*Pro Hac Vice* Forthcoming)
**SHAFFER LOMBARDO SHURIN**
911 Main Street, Suite 2000
Kansas City, Missouri 64105
(816) 931-0500 (Telephone)
(816) 931-5775 (Facsimile)
E-mail: RLombardo@sls-law.com
*Consumer Indirect Purchaser Plaintiffs*

116

William W. Heaton (*Pro Hac Vice* Forthcoming)
**HEATON & MOORE, P.C.**
44 North Second Street, Suite 1200
Memphis, Tennessee 38103
(901) 526-5975 (Telephone)
(901) 527-3633 (Facsimile)
wheaton@heatonandmoore.com
*Indirect Purchaser Business Plaintiffs*

**Attorneys for INDIRECT PURCHASER PLAINTIFFS**

EVERETT ELLIS, FREDRICK P. HEGE, JR.
MIKE FISHER, MICHAEL W. DAVIS,
JANE SCHMIT, JOHNNY WALKER,
JOHN E. MCDOWELL, MARTA MICHAUD,
TIMOTHY DUFFY, SEAN G. TARJOTO,
TODD STOWATER, DAVID C. KELLER,
JAMIE THAEMERT; SCOT DUNLAP;
SCOTT HUFFMAN; CHARLES RUSHER;
JENNIFER RUSHER; DAVID STANDRIDGE;
TROY GIBSON; GARTH RUSSELL, M.D.;
BHRAC, LLC, d/b/a BEVERLY HILLS RENT-A-CAR,
BEVERLY HILLS LEASING LLC
CETACEA SOUND, INC.,
COMPUTING SOLUTIONS, INC., d/b/a
WIRED! BY COMPUTING SOLUTIONS, d/b/a
WIRED! TECHNOLOGY PARTNERS
GOSSETT MOTOR CARS, INC., d/b/a
GOSSETT KIA; GOSSETT MOTOR CARS,
INC., d/b/a GOSSETT MAZDA;
GOSSETT MOTOR CARS, INC., d/b/a
GOSSETT HYUNDAI; GOSSETT MOTOR
CARS, INC., d/b/a GOSSETT MITSUBISHI;
GOSSETT MOTOR CARS, INC., d/b/a
GOSSETT AUDI; GOSSETT MOTOR CARS,
INC., d/b/a GOSSETT VOLKSWAGEN;
GOSSETT MOTOR CARS, INC., d/b/a
GOSSETT PORSCHE; GOSSETT MOTOR
CARS, INC. d/b/a/ GOSSETT CHRYSLER/
JEEP/DODGE; GOSSETT MOTOR CARS,
INC., d/b/a GOSSETT FIAT OF MEMPHIS;
WE 3 GOSSETT, LLC, d/b/a GOSSETT
VOLKSWAGEN OF GERMANTOWN;
WE 3 GOSSETT, d/b/a GOSSETT KIA SOUTH;

117

WE 3 GOSSETT, d/b/a GOSSETT HYUNDAI
SOUTH; WE 3 GOSSETT d/b/a GOSSETT FIAT;
AUTORAMA, INC., d/b/a MERCEDES BENZ OF
MEMPHIS, on behalf of themselves and all others similarly situated,

ANTITRUST CLASS ACTION COMPLAINT